D. SULLIVAN & CO. et al. v. RAMSEY et al.

(Court of Civil Appeals of Texas. San Antonio. March 12, 1913.)

1. TRIAL (§ 251\*)—INSTRUCTIONS—ISSUES.

Where, in an action to recover the value of a mortgaged building which defendants agreed to hold in trust for plaintiffs, purchasers of the equity of redemption, after foreclosing the lien, the issue was whether defendant company had purchased the mortgage debt under an agreement to protect plaintiffs' interests in the property, the submission of whether an individual defendant agreed to purchase the property from a substitute trustee for plaintiffs was properly refused.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 587–595; Dec. Dig. § 251.\*]

2. APPEAL AND ERROR (§ 1062\*)—HARMLESS ERROR—SUBMISSION OF ISSUES.

The submission of a special issue, in an action to recover the value of a mortgaged build-

ing which defendants agreed to hold in trust for plaintiffs, purchasers of the equity of redemption, after foreclosing the lien, was not fatally objectionable for requiring a finding whether title was placed in defendants' name by the mortgagor in trust for plaintiffs or for the purpose of defrauding mortgagor's creditors; the jury having found upon other issues that defendants held the equity in trust for plaintiffs.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 4212–4218; Dec. Dig. § 1062.\*]

3. TRIAL (§ 352\*)—SPECIAL INTERROGATORIES.

The rule as to leading questions to witnesses does not apply to special issues; the form of such issues not being subject to review on appeal, unless they intimate what answer is expected or desired.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 840–842, 844, 845; Dec. Dig. § 352.\*]

4. TRUSTS (§ 372\*)—FRAUD OF TRUSTEE—SUFFICIENCY OF EVIDENCE.

Evidence, in an action to recover the value of a mortgaged building which defendants agreed to hold in trust for plaintiffs, purchasers of the equity of redemption, after foreclosing the lien, held to show that a conveyance by defendants to another of the property was fraudulent as to plaintiffs.

[Ed. Note.—For other cases, see Trusts, Cent. Dig. §§ 600–603; Dec. Dig. § 372.\*]

5. TRIAL (§ 251\*)—INSTRUCTIONS—ISSUES.

It was unnecessary to submit to the jury as to when the petitions were filed, where there was no issue on that question.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 587–595; Dec. Dig. § 251.\*]

6. APPEAL AND ERROR (§ 909\*)—PRESUMPTIONS—SUPPORT OF JUDGMENT.

It is presumed on appeal that the trial court considered the contents of certain petitions, if their consideration was necessary to the rendition of the proper judgment.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. § 3675; Dec. Dig. § 909.\*]

7. TRUSTS (§ 362\*)—BREACH OF TRUST AGREEMENT—RIGHT OF ACTION.

Plaintiffs' right of action to recover the value of a mortgaged building which defendants agreed to hold in trust for plaintiffs, purchasers of the equity of redemption, after foreclosing the lien, under an agreement with plaintiffs' father, defendants' debtor, to foreclose the lien and hold the property in trust for plaintiffs, was not affected by any insolvency of plaintiffs' father when he conveyed his property in trust to defendants to pay his debts; plaintiffs having purchased the equity of redemption in the building before that time.

[Ed. Note.—For other cases, see Trusts, Cent. Dig. §§ 560–562; Dec. Dig. § 362.\*]

8. TRUSTS (§ 231\*)—BREACH OF TRUST.

The fact that one who agreed to hold mortgaged property in trust for the owners of the equity of redemption purchased it at the foreclosure sale for himself, and not for them, would not relieve him from liability to them for breach of his trust agreement.

[Ed. Note.—For other cases, see Trusts, Cent. Dig. §§ 330–335; Dec. Dig. § 231.\*]

9. MORTGAGES (§ 274\*) — RIGHTS OF MORTGAGOR—PURCHASER OF EQUITY.

The rights of a purchaser of the equity of redemption for a valuable consideration from the mortgagor would not be affected by any illegality in an agreement theretofore made by the mortgagor with a creditor to convey his

property to the creditor and pay the surplus, after paying the debts, to mortgagor's wife.

[Ed. Note.—For other cases, see Mortgages, Cent. Dig. §§ 718–724, 728; Dec. Dig. § 274.*]

**10. PLEADING (§ 250*) — AMENDMENT OF PLEADINGS—BREACH OF TRUST.**

In an action by the owner of the equity of redemption, originally brought to recover the price at which it was sold by mortgagee, in breach of an agreement to hold in trust for plaintiffs, the petition could be amended to recover the reasonable value of the property; the amendment merely affecting the measure of damages.

[Ed. Note.—For other cases, see Pleading, Cent. Dig. §§ 730–733; Dec. Dig. § 250.*]

**11. ELECTION OF REMEDIES (§ 1*)—RIGHT OF ELECTION.**

To sustain a defense founded upon the doctrine of election of remedies, plaintiff must have had two valid, available, and inconsistent remedies and actually undertook to pursue one of them.

[Ed. Note.—For other cases, see Election of Remedies, Cent. Dig. § 1; Dec. Dig. § 1.*]

**12. TRUSTS (§ 372*)—ACTIONS FOR BREACH— SUFFICIENCY OF EVIDENCE.**

Evidence, in an action to recover the value of a mortgaged building which defendants agreed to hold in trust for plaintiffs, purchasers of the equity of redemption, after foreclosing the lien, *held* to show a conversion of the property by defendants in repudiation of the trust agreement.

[Ed. Note.—For other cases, see Trusts, Cent. Dig. §§ 600–603; Dec. Dig. § 372.*]

**13. TRUSTS (§ 359*) — BREACH OF TRUST — REMEDIES OF BENEFICIARY.**

Upon breach of an agreement by the purchaser of a mortgage debt, upon foreclosing of the lien, to hold the property in trust for plaintiffs, plaintiffs could either sue for the property, or its value, as they elected.

[Ed. Note.—For other cases, see Trusts, Cent. Dig. §§ 554–565, 566; Dec. Dig. § 359.*]

**14. TRUSTS (§ 350*)—REMEDIES OF BENEFICIARY—CONVERSION OF TRUST PROPERTY.**

Upon the conversion of trust property by the trustee, the beneficiary may recover in equity the value of the property, that being his only remedy when the property has passed beyond his reach; and where a trustee had sold or pretended to sell the property to several different purchasers, so as to involve it in much vexatious litigation, the beneficiary could sue for its value, instead of following the property.

[Ed. Note.—For other cases, see Trusts, Cent. Dig. §§ 515, 519; Dec. Dig. § 350.*]

**15. TRUSTS (§ 233*)—CONVERSION BY TRUSTEE—MEASURE OF DAMAGES.**

The measure of recovery by a beneficiary for the wrongful conversion of land held in trust, in a suit for damages for breach of the trust agreement, and not for the proceeds of the sale, will be the value of the land at the time of trial, and not the usual measure of damages in ordinary cases of conversion.

[Ed. Note.—For other cases, see Trusts, Cent. Dig. § 339; Dec. Dig. § 233.*] .

**16. TRUSTS (§ 231*)—BREACH OF TRUST.**

All gain made by a trustee by the wrongful appropriation of the trust fund belongs to the cestui que trust, and all losses must be borne by the trustee, so that the beneficiary could recover the rents received by a trustee who wrongfully sold for his own use a building held in trust.

[Ed. Note.—For other cases, see Trusts, Cent. Dig. §§ 330–335; Dec. Dig. § 231.*]

**17. LIMITATION OF ACTIONS (§ 72*)—MINORITY —EFFECT OF MARRIAGE.**

The marriage of a minor put the statute of limitations running as to an action existing in her favor.

[Ed. Note.—For other cases, see Limitation of Actions, Cent. Dig. §§ 390–398; Dec. Dig. § 72.*]

**18. LIMITATION OF ACTIONS (§ 127*)—AMENDMENT OF PLEADINGS.**

The statute of limitations only bars a cause of action set up by an amended petition, where the amendment sets up a new cause of action different from that alleged in the original petition.

[Ed. Note.—For other cases, see Limitation of Actions, Cent. Dig. §§ 543–547; Dec. Dig. § 127;* Pleading, Cent. Dig. § 688.]

**19. LIMITATION OF ACTIONS (§ 127*)—AMENDMENTS—NEW CAUSE OF ACTION.**

An amended petition, which merely sought a greater amount of damages for the same right of action, did not set up a new cause of action, so as to be barred by limitations.

[Ed. Note.—For other cases, see Limitation of Actions, Cent. Dig. §§ 543–547; Dec. Dig. § 127;* Pleading, Cent. Dig. § 688.]

**20. PRINCIPAL AND AGENT (§ 171*)—LIABILITY OF PRINCIPAL — WRONGFUL ACTS OF AGENT.**

A principal cannot enjoy the benefits arising from a repudiated agency without also assuming the burdens imposed thereby.

[Ed. Note.—For other cases, see Principal and Agent, Cent. Dig. §§ 644–655; Dec. Dig. § 171.*]

**21. PRINCIPAL AND AGENT (§ 115*)—LIABILITY OF PRINCIPAL — WRONGFUL ACTS OF AGENT.**

The principal was bound by representations of a duly authorized agent.

[Ed. Note.—For other cases, see Principal and Agent, Cent. Dig. §§ 339–343; Dec. Dig. § 115.*]

**22. PRINCIPAL AND AGENT (§ 158*)—ACTS OF AGENT.**

The fraud of an authorized agent will invalidate a contract, though in perpetrating the fraud the agent acted without the principal's knowledge.

[Ed. Note.—For other cases, see Principal and Agent, Cent. Dig. §§ 589–598; Dec. Dig. § 158.*]

**23. PRINCIPAL AND AGENT (§ 23*)—EVIDENCE OF AGENCY.**

Evidence, in an action to recover the value of a mortgaged building which defendants agreed to hold in trust for plaintiffs, purchasers of the equity of redemption, after foreclosing the lien, *held* to show that one of the defendants was the agent of another in making representations as to the sale of the property.

[Ed. Note.—For other cases, see Principal and Agent, Cent. Dig. § 41; Dec. Dig. § 23.*]

**24. PRINCIPAL AND AGENT (§ 22*)—DECLARATIONS OF AGENT—PROOF OF AGENCY.**

Agency cannot be established by the declarations of the agent alone, but they will be considered in connection with other evidence, including proof of like acts ratified by the principal, for the purpose of establishing agency.

[Ed. Note.—For other cases, see Principal and Agent, Cent. Dig. § 40; Dec. Dig. § 22.*]

**25. FRAUD (§ 52*)—EVIDENCE.**

Great latitude in making proof of fraud is admissible, and every circumstance tending at all to show fraud is admissible in evidence.

[Ed. Note.—For other cases, see Fraud, Cent. Dig. § 48; Dec. Dig. § 52.*]

**26. EVIDENCE (§ 208*)—PLEADING IN FORMER ACTION.**

Where the parties to a former action and the issues therein were different from the parties and issues in the present action, the pleadings and proceedings in the former action were not admissible.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 713–725; Dec. Dig. § 208.*]

**27. EVIDENCE (§ 208*)—PROCEEDING IN FORMER ACTION.**

In an action to recover the value of a mortgaged building which defendants agreed to hold in trust for plaintiffs, purchasers of the equity of redemption, after foreclosing the lien, an answer filed by plaintiffs herein in a former action against them and defendants, at the instigation of defendants' agent, in which plaintiffs claimed the property, was admissible to show that defendants then recognized plaintiffs' claim, which was before the foreclosure sale.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 713–725; Dec. Dig. § 208.*]

**28. WITNESSES (§ 379*)—INCONSISTENT STATEMENTS—FORMER TESTIMONY.**

In an action to recover the value of a mortgaged building which defendants agreed to hold in trust for plaintiffs, purchasers of the equity from plaintiffs' father, who was defendants' debtor, evidence by a defendant in a former action by plaintiffs' father against defendants, in which judgment went against them, that the person who is claimed to have sold the property for defendants was not his agent, was not admissible, not contradicting defendants' evidence herein.

[Ed. Note.—For other cases, see Witnesses, Cent. Dig. §§ 1209, 1220–1222, 1247–1256; Dec. Dig. § 379.*]

**29. MORTGAGES (§ 377*)—FORECLOSURE—TRUSTEES' FEES.**

If the mortgagee and the owner of the equity of redemption agreed that no trustee's fees should be allowed for the foreclosure proceedings, such fees should not be assessed against the owner of the equity of redemption.

[Ed. Note.—For other cases, see Mortgages, Cent. Dig. §§ 1133–1136; Dec. Dig. § 377.*]

Appeal from District Court, Bexar County.

Action by Aggie Fant Ramsey and others against D. Sullivan & Co. and others. From a judgment for plaintiffs, defendants appeal. Reversed and remanded.

Denman, Franklin & McGown, of San Antonio, for appellants. Francis J. Kearful, of Mexico City, Mexico, Reagan Houston, Jr., George R. Thomson, and Reagan Houston, all of San Antonio, for appellees.

FLY, C. J. This suit was instituted by Aggie Fant Ramsey and husband, L. O. Ramsey, and Lucille Fant South and husband, James B. South, against D. Sullivan, W. C. Sullivan, J. C. Sullivan and D. Sullivan & Co., a copartnership composed of D. Sullivan and W. C. Sullivan, to require an accounting on their part of the amount of rents or profits received by them, or either of them, from a certain building in San Antonio, known as the Wright building, also the amounts paid by them or either of them for the taxes and other lawful charges thereon for the preservation and management thereof, and upon said accounting and final trial of the cause

to recover the sum of $175,000, the reasonable market value of a certain lot or parcel of land in the city of San Antonio, Bexar county, Tex., being lot 15, in block 17, new city block No. 407, on the north side of East Houston street at the corner of and on the west side of Navarro street, commonly known as the Wright building. It was alleged in the petition that on April 19, 1904, D. R. Fant, the father of the female appellees, owned and possessed the property described, which had been mortgaged by him to the State Life Insurance Company, of Indianapolis, Ind., on March 27, 1902, to secure his promissory note for $30,000, bearing interest at the rate of 6 per cent. per annum, which interest was represented by 10 separate promissory notes, each for $900 and due, respectively, every six months from the date of the principal note, which was due and payable on March 27, 1907; that on April 19, 1904, the said D. R. Fant, for a good and valuable consideration, by warranty deed, conveyed the Wright building to his said daughters, Aggie and Lucille, subject to the aforesaid mortgage. It was further alleged that during the years 1903 and 1904 D. R. Fant was heavily indebted to D. Sullivan & Co., which indebtedness he had secured by mortgages on various ranch properties owned by him, that he was in failing health, and it was proposed that D. Sullivan & Co. should foreclose the mortgages and take title to all the ranch properties, and to so administer the same that the greatest amount of money might be realized from them.

It was further agreed that from the sale of the property D. Sullivan & Co. should be paid, and the surplus returned to Mrs. D. R. Fant; that a trust was thereby created, and the utmost reliance was reposed in the trustees by Fant and wife, and the said D. Sullivan & Co. proposed, and it was acceded to by the Fants, that D. Sullivan & Co. should purchase the indebtedness secured by the Wright building from the insurance company, and foreclose the lien thereon and take title to the same and hold it in trust for the said Aggie and Lucille Fant; that the main trust agreement was referred to and used as the basis of the understanding, and it was agreed that a sufficient amount realized from the ranch properties should be used to clear the indebtedness against the Wright building, and that no attorney's fees were to be included in that indebtedness.

It was further alleged that Dr. Amos Graves, Sr., was the authorized agent of Sullivan & Co., who generally negotiated with the Fants in the trust agreement; that the agreement in regard to the Wright building was made by said Graves, as agent of Sullivan & Co., and by their attorney, J. C. Sullivan; that the agreement was ratified and

repeatedly confirmed until finally breached by Sullivan & Co.; that the notes were sold to D. Sullivan & Co. by the insurance company, and they foreclosed the mortgage and sold the property and bought and took title to the same in the name of D. Sullivan, paying about half its value, and from time to time, through Graves and J. C. Sullivan, the Fants were assured that the trustees would faithfully execute their trust according to their agreement. It was further alleged that appellants procured from one Garcia a claim to the said building, obtained by the latter through a sale under execution, which title inured to the benefit of appellees.

It was further alleged that on or about July 7, 1906, D. Sullivan, who held title to the property, for the purpose of defrauding appellees, Aggie and Lucille Fant, out of their equity in the property, made a pretended sale of it to Jot Gunter for about the amount of the mortgage debt, interest, attorney's fees, and other items charged against the property, and made a warranty deed to said Gunter, which was recorded, but on the same day, as a part of the same transaction, at the instance of D. Sullivan and his son and attorney, J. C. Sullivan, said Gunter executed and delivered to J. C. Sullivan, for the use and benefit of D. Sullivan & Co., a deed to said Wright building, which deed was kept secret and was not placed on record until July 31, 1909, and appellees had no knowledge of such deed until about November, 1909, when J. C. Sullivan, without knowledge or consent of appellees, contracted to sell said building to third parties for $100,000, and placed the deed from Gunter to him on record, in order to consummate said sale. It was charged that the repudiation of the trust agreement occurred at the time of the execution of the deed to Gunter by D. Sullivan, and the conspiracy was formed to defraud D. R. Fant and wife out of the net surplus of their estate, which was of the reasonable value of $500,000, and they were, in 1906, compelled to resort to the courts for redress, and recovered a judgment against D. Sullivan & Co. in about the sum named, from which judgment an appeal was prosecuted to the Court of Civil Appeals of the Fourth Supreme Judicial District of Texas, where the judgment was affirmed and a writ of error refused by the Supreme Court of Texas.

Appellees further represented that in pursuance of their agreement D. Sullivan & Co. took possession of the Wright building, and except for the year 1905 collected the rents from the same; that for the purpose of confusing matters they have set up divers claims to the building, J. C. Sullivan claiming that he owns it, and D. Sullivan claiming that it is his property; that they have made sundry contracts in connection therewith, one by J. C. Sullivan to I. and A. Lang, a contract of sale, and one to Lupe &

Taylor, in which one J. F. Ryan claims to have contracted for the property; that Lupe & Taylor have sued the Sullivans, Mrs. Gunter, and Lang to enforce the contract; that appellants have refused to make an accounting to appellees, or to recognize their rights in connection with the property, and they prayed for $175,000, the reasonable market value of the property, and $100,000, exemplary damages.

Appellants answered by general and special exceptions and general denial and pleaded not guilty, and specially denied the trust, the agency of Graves and J. C. Sullivan, pleaded two and four years' limitations, and claimed to have bought the lot in good faith at the sale under the mortgage, and to have sold in good faith to Jot Gunter, and to have repurchased from him in good faith.

The cause was submitted on nine special issues, in answer to which the jury found that John C. Sullivan was authorized to and did act for D. Sullivan or D. Sullivan & Co., and agreed that one or the other should acquire the mortgage on the Wright building and hold the same in trust for Aggie and Lucille Fant, subject to the debt; that Dr. Amos Graves, Sr., was authorized to and did act for D. Sullivan or D. Sullivan & Co., and agreed that the property should be acquired and held in trust by D. Sullivan or D. Sullivan & Co. for Aggie and Lucille Fant; that the title to the property was placed in D. Sullivan, to be held for Aggie and Lucille Fant; that D. R. Fant made the deed to his daughters, Aggie and Lucille, in consideration of insurance money he owed them; that at the time the deed to the property was executed to Jot Gunter by D. Sullivan it was understood between them that Gunter should convey the property to J. C. Sullivan in trust for D. Sullivan; that D. Sullivan, on or about June 6, 1906, repudiated the trust agreements made by his son and Dr. Graves; and that the reasonable cash value of the property in controversy at the time of trial was $2,750 for each front foot. In addition the court embodied in the judgment his conclusions that D. R. Fant owned the property, being a lot at the northwest intersection of Houston and Navarro streets, fronting 56.6 feet on Houston street, and extending back between parallel lines to an alley 158 feet, more or less; that on March 27, 1902, he executed and delivered to the State Life Insurance Company of Indianapolis, Ind., a deed of trust on the property to secure a promissory note for $30,000, principal, and several notes, each for $900, for the interest; that D. Sullivan acquired from the insurance company the several promissory notes, paying therefor $30,900; that the trustee named in the deed of trust resigned, and J. C. Sullivan was appointed in his stead by D. Sullivan & Co.; that the substitute sold, under the deed of trust, on July 4, 1905, and D. Sullivan

bought, the property, and on July 7, 1906, conveyed it to Jot Gunter, and the deed was immediately recorded; that on the same day, July 7, 1906, Jot Gunter conveyed the property to J. C. Sullivan, but the deed was not recorded until July, 1909, and neither of the appellees had any notice of any kind of the existence of the deed until the date last named; that in 1911, while this suit was pending, J. C. Sullivan conveyed the property to his codefendant and father, D. Sullivan, expressing as the consideration that he (J. C. Sullivan) had acquired title to the property from Gunter in trust for D. Sullivan, and had been holding it for him; that appellees filed original petition on February 15, 1910, and on December 5, 1911, filed their first amended petition. It was further found in the judgment that on April 19, 1904, by general warranty deed, the father conveyed the property in controversy to his daughters, Aggie and Lucille, subject to the mortgage of the insurance company, that Aggie was married to L. O. Ramsey on April 11, 1906, and Lucille was married to James B. South on March 10, 1909, since which dates they have been continuously married; that the legal record title was in J. C. Sullivan when this suit was instituted, and there was then on record a contract by which said J. C. Sullivan agreed to sell to I. and A. Lang the property, and there was a suit pending in a district court of Bexar county, by Lupe & Taylor, in which they claimed to hold a contract from J. C. Sullivan to purchase the property, and said suit was still pending, and that the value of the property as fixed by the jury was $155,650, and the rents collected from the building amounted to $42,146, the building and rents amounting to $197,796.07; that the amounts for which appellants should have credit amounted to $81,198.74, which being deducted from the $197,796.07 left a balance in favor of appellees for $116,597.33, for which sum judgment was rendered in favor of appellees.

[1] The first assignment of error complains of the refusal of the court to submit an issue as to whether D. Sullivan purchased the property from the substitute trustee for Aggie and Lucille Fant, or had agreed to purchase it for them. The property was not sold on July 4, 1904, by the trustee, but on July 4, 1905, and the special issue was defective in that regard; but independent of that defect the true issue in the case was whether D. Sullivan & Co. had purchased the notes from the insurance company in pursuance of an agreement that they would protect the interests of Aggie and Lucille therein, and the court fully submitted to the jury the purpose for which the title to the Wright building was placed in D. Sullivan, and the jury found that it was so placed in trust for Aggie and Lucille Fant. For the reasons indicated, the court did not err in refusing to submit the special issue, and the first assignment of error is overruled.

[2] The second assignment of error assails the third special issue submitted by the court, because it requested the jury to find whether the title to the property was placed in the name of D. Sullivan in trust for appellees, or for the purpose of hindering, delaying, or defrauding the creditors of D. R. Fant; the ground of objection being "that the jury should have been required to find on both of such issues, instead of being limited in the alternative to only one of them, and in that the jury should also have been required to find whether D. Sullivan took title for himself and without any agreement." The jury had been required in questions 1 and 2 to find as to whether there had been an agreement on the part of D. Sullivan to acquire the title for Aggie and Lucille, and it did not matter whether he took the title for himself or to carry out the trust, or to defraud Fant's creditors, if, as found by the jury, the equity in the property belonged to Aggie and Lucille. If the property was sold to Aggie and Lucille by D. R. Fant to pay them for certain insurance, and D. Sullivan accepted the trust for them, his intention in buying the land at the mortgage sale could not affect the interest of appellees. He may have intended at the time the sale was made to appropriate the property of appellees to his own use, but unless appellees knew of that intention is could have no effect on the issues. However, the jury effectually answered for whom the property was bought at the foreclosure sale, and stated that up to that time the trust had not been repudiated by D. Sullivan.

[3] The issue, the rejection of which is attacked in the third assignment of error, is as to the agency of Dr. Amos Graves, Sr., which question was fully and clearly presented in the second question submitted by the court. And the issue as submitted is not subject to the attack made on it in the fourth assignment, that it was leading and suggestive of an affirmative answer, and did not submit the real question to the jury, made by the evidence. The criticism is not well founded. The rule as to leading questions to witnesses is not applied to issues submitted to a jury by a court; and, unless there is an intimation by the court as to what answer is expected or desired, an appellate court will not interfere with the exercise of his discretion. O'Farrell v. O'Farrell, 56 Tex. Civ. App. 51, 119 S. W. 899; Moore v. Miller, 155 S. W. 573, by this court, not yet officially published. There is nothing in the questions asked by the court in this case suggestive of the answer. What has been stated in regard to the third and fourth assignments of error disposes of the fifth and sixth assignments also, which make the same points in regard to the submission of the agency of J. C. Sullivan.

[4] The question of the bona fides of the conveyance from D. Sullivan to Jot Gunter and from the latter to J. C. Sullivan was clearly submitted to the jury, and the court did not err in refusing the special question embodying the issue of a bona fide conveyance by Sullivan to Gunter of the property. The question of good faith was put squarely before the jury, and as a precaution they were instructed that they "must believe, from a preponderance of the evidence introduced in this cause, that said transaction was not in good faith; for fraud is not presumed, but must be proven by competent evidence." The quotation from the evidence of D. Sullivan in regard to the sale to Gunter does not militate in the least against the finding of the jury that the sale to Gunter was not made in good faith. The jury might well have disregarded a statement to the effect that Gunter bought the property, and on the same day returned and executed a deed to J. C. Sullivan, because his doctor had told him he had to go to. California if he wished to preserve his life. No payment was made on the property, but a promissory note given for the whole of the purchase money. This was followed by a conveyance to John C. Sullivan, evidently a part of the same transaction, in which the consideration recited was the assumption of the note to D. Sullivan and the payment of $506 cash. The cash was not paid. D. Sullivan swore that his deed to Gunter was executed in the morning of July 7, 1906, and that "he put it on record right away." The clerk's certificate showed that the deed was filed for record at 5:30 o'clock p. m., doubtless after the deed to John C. Sullivan had been executed. No reason is assigned for the record of the deed if the conveyance to J. C. Sullivan was made in pursuance of a contract to rescind the sale. According to the evidence of D. Sullivan, Gunter was very anxious to rescind the sale, and yet in the late afternoon he filed the deed, which he must have held all day, if it was executed in the morning. It is rarely the case that fraud can be proved by direct, positive evidence, because it hides itself in secret places, and resort must usually be had to circumstances, which oft proclaim it with a force "as strong as Holy Writ." There can be no weight given to the contention that a finding that there was an agreement at the time the deed was made to Gunter that he should at once reconvey it to Sullivan was not a submission of the good or bad faith of the transaction. Such an agreement could have been nothing but the offspring of fraud and deception.

[5,6] The ninth, tenth, and eleventh assignments of error complain because the court refused to ask the jury when the original and first and second amended petitions were filed, and what was sued for in each of them. There was no controversy on those points, and it was unnecessary to submit them to the jury. They were not issues at all. The court found the dates, and it will be presumed he considered the contents of the petitions, if necessary to the rendition of the proper judgment.

[7] The twelfth, thirteenth, fourteenth, and fifteenth assignments of error are overruled. The issue as to Fant's intention in making the sale to his daughters was clearly submitted, and it was found that the transfer was made to pay a debt, and not to defraud creditors, and it was useless to ask questions on the same subject. The solvency of D. R. Fant was of no importance, and the court properly refused to incumber the record with such extraneous matters. The property was conveyed to his daughters before the trust agreement was made, and Fant's financial condition at the time of that agreement could not affect their interests.

[8] The sixteenth assignment of error is too general, and is not meritorious. The facts necessary to support the judgment, not found by the jury were found by the court. The assignment is not followed by a statement of any facts tending to sustain it. The fact that D. Sullivan may have purchased the property at the foreclosure sale for himself, and not for those to whom he stood in the relation of trustee, would not exonerate him from his liability. All the issues necessary to be found by the jury were submitted to them.

The seventeenth assignment of error complains that the bona fides of the transaction between Sullivan and Gunter was not submitted to the jury. As hereinbefore stated, that issue was submitted, and the jury found against the good faith of the transaction. The assignment is overruled.

[9] The eighteenth assignment of error is to the effect that the trust agreement made by Fant and wife with D. Sullivan & Co. in 1904 was against public policy, because D. R. Fant was largely indebted at the time, and the agreement, was that the surplus, after paying the debts of Sullivan & Co., was to be paid to Mrs. Fant. How that could affect property sold to Aggie and Lucille by their father, D. R. Fant, in payment of a debt of about $11,000, the property being mortgaged in the sum of $30,000, that sale having been made months before the trust agreement, is not made to appear by appellants. The property, burdened with the mortgage, was the property of the daughters of Fant, and whatever he and Sullivan may have intended as to the creditors of Fant it could not affect their rights. They are not claiming any of the property that was the subject of the general trust agreement, but they are claiming property conveyed to them long before the trust agreement was made. The court very properly refused to submit such an issue to the jury.

[10,11] The contention that appellees are

bound by the allegations of their original and first amended petitions and could not amend them, for that is the effect of the proposition that they had elected to sue for the price at which D. Sullivan sold the property and were bound irrevocably thereto, cannot be sustained. No authority is offered for the proposition that if a cestui que trust files a petition following one mode of redress that he cannot by amendment change it to another. Of course, if a cestui que trust were to institute suit and obtain a personal judgment against the trustee, he could not afterwards follow the trust property; but that is not this case. However, the allegation as to the sale by J. C. Sullivan of the property for $100,000 was made under the belief that there had been a sale, and when it transpired that there had been no sale, but that D. Sullivan at all times claimed the property, appellees could not be held to an election made under the belief that appellants had not simulated a sale. In addition, appellees sued for the reasonable value of the property, and they could undoubtedly amend so as to sue under another measure of damages. Appellees had only one remedy, and that was to sue the trustees, and they had adhered to that remedy, merely amending so as to set up one measure of damages instead of another, about which they had been misled by the acts of appellants. As said in Bandy v. Cates, 44 Tex. Civ. App. 38, 97 S. W. 710, speaking of estoppel by election: "In order to sustain a defense founded upon that doctrine, it must be made to appear that the plaintiff actually had two valid, available, and inconsistent remedies, and that he undertook to pursue one. His supposition that he had a particular remedy and his effort to enforce it is immaterial, and does not constitute an election, unless the remedy in fact existed." If appellees sought a different remedy in their first pleadings from that in their last, it was under a mistake of fact by which they would not be bound.

In the case of Asher v. Pegg, 146 Iowa, 541, 123 N. W. 739, 30 L. R. A. (N. S.) 890, the Supreme Court of Iowa, citing and approving Bandy v. Cates, held: "Plaintiff entirely mistook her remedy in the former action and asserted a state of facts which did not exist; that is, which was subsequently found in the proceeding not to be established by the evidence. This was a plain case of mistake of remedy, and not election of remedy. We do not understand that it is material, in determining that there is no election where a mistaken remedy is resorted to, that it should be found the claim first asserted was in good faith. If a claim is made which, as developed in subsequent proceedings, does not exist, then the claimant is not barred from asserting in an independent action that an inconsistent claim existed, entitling him to legal redress." To the same effect are Bierce v. Hutchins, 205 U. S. 340,

27 Sup. Ct. 524, 51 L. Ed. 828, and Snow v. Alley, 156 Mass. 193, 30 N. E. 691.

[12, 13] D. Sullivan testified that the property was a part of the assets of the Gunter estate; that the deed to J. C. Sullivan was not designed to go into effect; that when Gunter came back from California he (D. Sullivan) told him, "There it is, your property." And, further: "So he took possession. It was listed among the assets of his estate." Yet in view of that testimony it is stated in the twentieth assignment of error that "the evidence fails to show any such conversion or breach of trust by the trustee as will authorize the plaintiffs to sue them or either of them for damages, but the suit should have been for the property known as the Wright building." Out of the mouth of D. Sullivan himself, a conversion was shown, and appellees could sue for the property, or for its value, as they might desire.

[14] It is a well-settled rule of law that, where a trustee wrongfully converts trust property to his own use, the cestui que trust is entitled, in equity, to a personal decree for the value of the property so converted. Boothe v. Fiest, 80 Tex. 141, 15 S. W. 799; Silliman v. Gano, 90 Tex. 637, 39 S. W. 559, 40 S. W. 391; Loomis v. Satterthwaite, 25 S. W. 68; Home Inv. Co. v. Strange, 152 S. W. 510. In addition to the claim of the beneficiary upon the trust estate, the trustee incurs a personal liability for a breach of trust by way of compensation or indemnification, which the beneficiary may enforce at his election which becomes his only remedy when the trust property has been placed beyond his reach by the wrongful act of the trustee. Pom. Eq. Jur. § 1080. Appellants had sold the property, not only to Gunter, but to other parties, and the land was involved in a perfect mesh of vexatious litigation, into which appellees could not be dragged by men to whom they had intrusted their property. Neither law nor equity would compel them to bring a suit for the property itself under such circumstances, even though they may have believed that the sales were simulated, and that the real title was still in the trustees. Before they could be compelled to sue to the property itself, rather than to the trustees, for reimbursement, the property should be in as favorable a condition as it was when placed in the hands of the trustees. They could not be compelled to sue for property loaded down with litigation made possible by the trustees. As said by the Supreme Court in the cited case of Silliman v. Gano: "But we are of the opinion that when the trustee has treated the property as his own, and has sold it and thereby passed the legal title, he is in no position to demand that his cestui que trust shall proceed against the purchasers; and that by the breach of trust he becomes, in any event, personally liable to make compensation to the beneficiary for his property. It is equitable that

the cestui que trust should recover of a purchaser with notice, if he elects to do so; but it is inequitable, at least between the trustee and purchaser, that he should be required to proceed against the latter and let the former go free. * * * We are of opinion, therefore, that when the trustee betrays his trust by a sale of the property the beneficiary can hold him responsible for its value, although he may, if he so elect, be enabled to proceed against the property sold."

Appellants seek to have the rule as to the measure of damages in ordinary cases of conversion applied to them; but, as said by the Court of Civil Appeals in the Third District in the case of Mixon v. Miles, 46 S. W. 105: "The general rule concerning the liability of trespassers for the conversion of property does not apply in a case of this character, which is to the effect that the value of the property, with interest thereon, at the time of conversion, is ordinarily the measure of damages in such a case. A different principle, we think, obtains in a case like this, where the evidence shows a gross abuse of duty on the part of the trustee." A writ of error was refused in that case, in a written opinion by the Supreme Court, and as to the measure of damages, citing the case of Boothe v. Fiest, 80 Tex. 141, 15 S. W. 799, the court said: "It was held that the measure of damages was either the purchase money for which the land was sold and interest, or the value at the time of the trial, at the option of the plaintiffs, less, of course, in either case, the amount of the mortgage debt." Mixon v. Miles, 92 Tex. 318, 47 S. W. 966.

[15] In the cited case of Boothe v. Fiest it was held, after quoting from Perry on Trusts (section 844): "This rule would indicate that, where the beneficiary sues for compensation, and not for the proceeds of the sale, with interest, the measure of his recovery would be the value of the land at the time of the trial; and we think such the proper rule in this case." That was said in a case of violated trust, and citing it and the Mixon v. Miles Case the Supreme Court, in the case of McCord v. Nabours, 101 Tex. 494, 109 S. W. 913, 111 S. W. 144, held: "It is objected to the instruction given in connection with the measure of damages that the Court of Civil Appeals directs the trial court to assess the value of the land at the time of the trial and to give interest on the sum so assessed from the date when the property was misappropriated by McCord. If this were a proper construction of the opinion, we would hold it to be erroneous, but we are of opinion that the language of the court means nothing more than that when the judgment is entered for the value at the time of the trial that judgment shall bear interest, which would be just the effect the law would give it if the court had not mentioned the question of the interest."

Those decisions fixing the measure of damages in cases of broken faith and violated trust are based upon the principle that no man who has trampled upon the trust reposed in him by another, in regard to his property, shall be allowed to reap a benefit therefrom, but shall return to the beneficiary the enhanced value of the property, if such has occurred. It would be putting a premium upon disloyalty and bad faith if a trustee who has breached his trust and converted the property of the cestui que trust to his own use and benefit could answer for his breach of the trust by paying a lower value than that at time of trial.

The facts in this case are such that appellees could not fix the date of conversion with any degree of certainty. Although it was testified by D. Sullivan that the property was sold to Jot Gunter in 1906, yet the books of D. Sullivan & Co. show that up to and including November, 1911, they had collected the rent for the building—that is, for about six years—amounting to the sum of $42,146.-07. This fact, with others, tends to show that the property had been claimed by D. Sullivan all the time, and that the different sales had been simulated, and such being the case the rents and profits belonged to appellees, and it was proper to render judgment for them. If it be true that when the property is still in the hands of the trustee the beneficiary cannot, as contended by appellants, sue for anything except the property, yet where the trustee has so obscured the title by transfers of the property, and has provoked vexatious litigation with other persons, he cannot hide himself behind the rule invoked in this case, but a suit against him will be sustained, not only for the value of the premises, but also for the rents he has collected therefrom. Circumstances have been created by appellants that render it doubtful as to whom the premises in question rightfully belong, and they will be held responsible for all the doubt and uncertainty. They will not be permitted to charge appellees for the principal of the note, interest on the principal and interest on interest, for 10 per cent. attorney's fees, for $14,284.72 for management and operation of the property, including taxes, insurance, repairs, and trustee's fees, for a judgment in favor of Garcia and for another attorney's fee amounting to $525, all amounting to $81,198.74, and then claim that they are entitled to $42,146.07, rents and revenues collected from the property during the time that the charges accrued against appellees. According to the testimony of D. Sullivan, the property was conveyed in good faith to Gunter, yet he collected the rents, paid the taxes, and managed and controlled it. It was Gunter's property, and yet it had been conveyed by Gunter to J. C. Sullivan, and by him it had been contracted to I. and A. Lang, to Lupe & Taylor and J. F. Ryan, and appellees had

no means of knowing to whom the property rightfully belonged, and undoubtedly had the right to look to appellants for their rents and damages. They could not follow the property, had they desired to have done so. They were not required to attempt to follow it on the tortuous journey it has made.

[16] In the case of Oliver v. Piatt, 44 U. S. (3 How.) 333, 11 L. Ed. 622, the trustee repurchased the land he had converted, the property of his cestui que trust, and tendered it to the latter, and the Supreme Court of the United States held: "It is a clearly settled principle in that [equity] jurisprudence that whenever the trustee has been guilty of a breach of the · trust, and has transferred the property, by sale or otherwise, to any third person, the cestui que trust has a full right to follow such property into the hands of such third person, unless he stands in the predicament of a bona fide purchaser for a valuable consideration, without notice. * * * This right or option of the cestui que trust is one which positively and exclusively belongs to him, and it is not in the power of ·the trustee to deprive him of it by any subsequent purchase of the trust property." The court said: "The rule in equity is that all gain made by the trustee, by wrongful appropriation of the trust fund, shall go to the cestui que trust, and all the losses shall be borne by the trustee himself." That principle applied in this case justifies a suit for damages and the rents of the property.

[17-19] Mrs. South was a minor when she married on March 10, 1909, and the marriage put the statute of limitations to running. The fraud was discovered in November, 1909, and the suit was filed on February 15, 1911, not more than 15 months after such discovery. Kennedy v. Baker, 59 Tex. 150. The cause of action was not barred, as claimed in the twenty-seventh assignment of error. The second amended petition did not set up a new cause of action. The original petition claimed damages for the breach of a trust, and both amended petitions did likewise. Limitation only operates as a bar when it is sought by amendment to set up a new cause of action. Thouvenin v. Lea, 26 Tex. 614; Woods v. Huffman, 64 Tex. 99. The amended petitions did not change the cause of action, but merely sought enlarged relief and a greater amount of damages. McIlhenny v. Lee, 43 Tex. 209; Porterfield v. Taylor, 60 Tex. 264; Raleigh v. Cook, 60 Tex. 438; Telegraph Co. v. Brown, 62 Tex. 536; Telfener v. Dillard, 70 Tex. 139, 7 S. W. 847; Railway v. Pape, 73 Tex. 501, 11 S. W. 526. The authorities cited have no bearing on this case.

There is no evidence tending to show that Jot Gunter or his estate, or any one else, got any of the rents from the property. It did not matter whether the rents were placed on the books as "Gunter Rents" or "Sullivan Rents"; no one but D. Sullivan & Co. obtained any benefit from them. This disposes of the thirty-second assignment of error.

[20] The evidence of Graves' statements was properly admitted. Sullivan acted in most particulars as the statements of Graves indicated that he would. The fruits of the agency, now repudiated, were enjoyed by D. Sullivan & Co., and it is a principle of the highest form of justice that a principal will not be permitted to keep and enjoy the benefits arising from a repudiated agency without assuming the burdens imposed by the agency. As vigorously and pertinently said by the late Justice Neill in Goldschmidt v. Wagner, 99 S. W. 737, a case of repudiated agency: "And if there was any sale at all it was subject to the terms of the contract. If not subject to its terms, there was no sale, and appellee would be entitled to the money he paid appellant upon returning the machine. But as one 'cannot blow hot and cold' with the same breath, the appellant, when claiming to retain the purchase money, cannot say there was no sale."

[21-23] Appellants took up the notes and mortgage on the basis of an agreement made by Dr. Graves, and they also accepted the benefits from J. C. Sullivan's agency. The latter, by his promises to Judge Brooks, who was representing appellees, prevented a sale of the property to Perry J. .Lewis only a few days before it was sold under foreclosure proceedings by representing to Judge Brooks that after taking title D. Sullivan would be able to obtain a better price. That representation prevented Aggie and Lucille Fant from realizing six or seven thousand dollars more than was required to satisfy the mortgage debt. If J. C. Sullivan was acting for D. Sullivan in the sale of the property and was his agent, then he was bound by the ·representation. He had supplanted the regular trustee at the instance and desire of D. Sullivan and the evidence indicates he was acting for his father. The latter obtained the land through the representations of J. C. Sullivan. As said in Henderson v. Railroad, 17 Tex. 560, 67 Am. Dec. 675: "Nothing is better settled than that the fraud of an authorized agent will invalidate a contract, entered into by him on behalf of his principal, though in perpetrating the fraud the agent acted without the knowledge or consent of the principal." The force of this principle cannot be parried or evaded by a claim that J. C. Sullivan was not the agent of his father, but the trustee acting for both parties. If it had not been expected that he would represent his father in the sale, there would have been no need of a request that the original trustee, Floyd McGown, a fair and impartial man, should resign. On October 7, 1904, he did resign, and on October 8, 1904, J. C. Sullivan, al-

though he was not appointed substitute trustee until October 10th, was requested by D. Sullivan & Co. to sell the property, because interest was overdue. He sold it, and D. Sullivan bought it.

The case of Barbee v. Spivey, 32 S. W. 345, applies with much force to the facts in this case as to the agency of both Graves and J. C. Sullivan. As in this case, so in that, the original trade was negotiated by a go-between, who agreed that a deed made to the defendant should be treated as a mortgage. The defendant denied the agency and swore that he made the agreement in person, and that the conveyance of the title was absolute. There were circumstances shown in favor of and against the existence of the agency. The court said: "If, as claimed by plaintiff, Stringfellow alone made the agreement, though without previous authority from defendant, we do not think that it is true that the latter could take the deed, even if he did not know of the agreement with which it had been made, and hold it, contrary to the agreement upon which it was given, disregarding the rights reserved to plaintiff. He could not repudiate the transaction in part and enforce it in part. Accepting the benefits of Stringfellow's acts, he took them with their infirmity, unless he was in an attitude to claim the protection given to an innocent purchaser, which the evidence does not show."

[24, 25] In connection with the thirty-third to the thirty-ninth assignments of error, inclusive, all of which refer to the declarations and representatives of Dr. Graves and J. C. Sullivan, it may be said that agency cannot be established by evidence of the declarations of the agent alone, but such declarations will be considered, in connection with other facts, to prove agency, and proof of other like acts ratified by the principal may be used to establish an agency. In cases like this where fraud is charged, great latitude is allowed in making the proof. Fraud hides itself in secret places and covers its tracks, so far as human ingenuity can cover them, and the strict rules of evidence will not be applied to efforts to reveal it, but every circumstance tending in the least to bring it to light will be admitted in evidence. Positive and express proof is not required in law or equity. Compton v. Marshall, 88 Tex. 50, 27 S. W. 121, 28 S. W. 518, 29 S. W. 1059; Burnham v. Logan, 88 Tex. 1; 29 S. W. 1067. Under the facts in this case the declarations were admissible.

[26] While, as stated, great latitude is allowed in establishing fraud, still there is a limit that cannot be passed. The evidence offered must not ruthlessly set aside other important rules and run riot in the field of evidence. In this case, no doubt, it was permissible to prove that Graves had acted as agent for D. Sullivan & Co. in relation to the ranch properties; but no valid excuse or justification can be rendered for showing the allegations of the petition of D. R. Fant and wife in a suit with the Sullivans, and not only that, but the verdict of the jury and judgments of the district court and Court of Civil Appeals. That testimony did not tend to show the agency of Graves in this case, nor the fraud connected with the property herein involved. The only tendency it could have was to inflame the minds of the jury and arouse a desire to wreak vengeance on those who had been convicted of fraud in another case. The facts were strong and, no doubt, bore heavily upon the minds of the jury, while determining the questions of fraud in this case. The baleful effects of such evidence could not be met and counteracted by any amount of testimony. The parties in the former case were not the same, the issues were different, and the pleadings and matters pertaining to that case were inadmissible. Railway v. Heidenheimer, 82 Tex. 195, 17 S. W. 608, 27 Am. St. Rep. 861; MacDonnell v. De Los Fuentes, 7 Tex. Civ. App. 136, 26 S. W. 792. The jury would naturally conclude that, the allegations in the petition in the former case having been found to be true, although denied by Sullivan & Co., the allegations in this suit must be true, and the proof of the pleadings, verdict, and judgment would have a deadly effect upon the interests of appellants in this suit. The relations that Graves bore to Sullivan in the former case, the subject of litigation, and the parties thereto could well be proved, but not the self-serving allegations of the petition and the verdict and judgment.

The evidence of D. R. Fant, Jr., complained of in the fifty-third and fifty-fourth assignments of error, was permissible as tending to show the relations of appellants with the Fant family and the character of the transaction in connection with the ranch properties.

The fifty-fifth assignment of error is overruled. The evidence assailed by appellants was admissible to show the consideration for the deed from D. R. Fant, deceased, to his daughters. It was especially admissible because appellants claimed that the conveyance was made to defraud the creditors of Fant.

[27] The answer of appellees, Aggie and Lucille Fant, in the case of Garcia v. D. Sullivan et al., filed in December, 1904, wherein they claimed the land in controversy in this suit as having been conveyed to them by their father in satisfaction of an indebtedness of more than $10,000, is complained of in the fifty-sixth, fifty-seventh, and fifty-eighth assignments of error. The answer as filed at the instigation of Graves, claimed to be the agent of Sullivan & Co., was evidence that appellees were then claiming the land and were co-operating with Sullivan in

holding it. If Sullivan, through Graves, procured the filing of the answer, it tended to show his recognition of the claim of the appellees to the property a short while before the foreclosure sale.

The evidence complained of in the fifty-ninth assignment of error was permissible because in regard to all of the trust property, in which conversation D. Sullivan, according to the testimony of Mrs. Ramsey, "also mentioned the equity in the Wright building."

The sixtieth assignment of error is on an immaterial matter, and is overruled, and we are unable to see how the letters of Sullivan to Fant could confuse the jury. They tended to contradict certain statements made by Sullivan as to his relations with Fant, and were admissible.

For the same reason, the notes given by Fant to J. C. Sullivan were permissible to contradict the assertion of D. Sullivan that he had no agents, and that his son John "was simply an attorney to try my case; that was all."

[28] We do not think that testimony that D. Sullivan had sworn on the trial in the case of D. R. Fant and wife against the Sullivans that Graves was not his agent was admissible. Taken in connection with the verdict and judgment in that case, it must have exerted an improper influence on the jury. It could have had no purpose, except to show that the jury had disregarded the testimony of D. Sullivan in that case; and therefore it should be disregarded in this case. It did not contradict Sullivan in this case, and could have served no purpose, except to inflame the passion and arouse the prejudice of the jury. Appellees make no effort to justify its admission, but merely assert that it was not error to admit it, and that Sullivan had sworn in this case that Graves was not his agent in regard to the negotiations which furnished the basis of the other suit. He did not testify, however, to what he swore in the other case, when the verdict went against him, and that is where the sting of the testimony is concealed.

[29] If the evidence in the case showed there was an agreement between D. Sullivan and appellees that no trustee's fees should be paid for the foreclosure proceedings, they should not be assessed against appellees. There was no justification whatever in the evidence for the allowance of attorney's fees in addition to trustee's fees, if the aforesaid agreement was in effect. The foreclosure proceedings were a part of the contract, and if the contract existed as found by the jury the fees for trustee and attorney should not have been allowed. This is written in response to a cross-assignment of appellees.

For the errors herein indicated, the judgment is reversed and the cause remanded.