**David S. HALL and Charles Chambers, Appellants,**

v.

**F.A. HALAMICEK ENTERPRISES, INC., and F.A. Halamicek, Appellees.**

No. 13–83–309–CV.

Court of Appeals of Texas, Corpus Christi.

March 8, 1984.

Gary L. Crofford, Hofheinz, Harpold, McDonald & Fitzgerald, Houston, for appellants.

Homer Taylor, Duckett, Bouligny & Collins, El Campo, for appellees.

Before BISSETT, KENNEDY and GONZALEZ, JJ.

## OPINION

BISSETT, Justice.

This is an appeal from summary judgments wherein David S. Hall and Charles Chambers were plaintiffs and F.A. Halamicek Enterprises, Inc., and F.A. Halamicek were defendants. Each plaintiff sued defendants to recover damages in the amount of $10,000.00, exemplary damages and attorney's fees for alleged fraud in the sale of interests in the working interest in an oil and gas lease. Each defendant filed a separate motion for summary judgment. Each motion was contested by the plaintiffs. The trial court granted both motions, and judgments were rendered that the plaintiffs take nothing against each defendant.

Henceforth, plaintiffs will sometimes be referred to by name and sometimes as "plaintiffs." The defendants will sometimes be referred to as "Enterprises" and "Halamicek," respectively, and sometimes as "defendants."

Enterprises is a Texas corporation. Halamicek is President and a major shareholder of Enterprises. Enterprises is in the business of exploring for oil and gas, and producing oil and gas after production is obtained. Kenneth R. Johse, who is not a party to this lawsuit, hereinafter referred to as "Johse," is a certified public accountant, who has Enterprise and Halamicek among his clients.

Enterprises, who desired to drill for oil or gas on the Mikus lease, in Lee County, Texas, sold interests to several investors at $10,000.00 for a 1% interest in the 60% working interest in the Mikus lease. Each plaintiff paid $10,000.00 to Johse for a 1% interest of the working interest in the proposed well. In turn, Johse paid Enterprises the sum of $70,000.00, for a 7% interest in the working interest, which covered investments in the well made by persons, including plaintiffs, who were not clients of Johse. Additionally, other investors who were clients of Johse paid certain sums of money to Johse, who then paid such monies directly to Enterprises. An attempt was made to complete the well in the "Buda." This attempt failed to establish production. Then, an attempt was made to complete the well in the "chalk"; it, too, failed. Attempts were later made to establish production at a higher level, but during such operations a hole appeared in the casing at about 4,000 feet below the surface of the ground. In an effort to patch the hole, a "squeeze tool" became stuck in the casing and the well was plugged and abandoned. There was never any production in commercial quantities from the drilling operations on the Mikus lease. None of the $10,000.00 invested by each plaintiff was returned.

Plaintiffs, in this suit alleged that Enterprises had defrauded them through its "duly authorized" agent, Johse. They further alleged that Johse solicited investments from them in the Mikus well, and that he falsely represented to each of them: 1) that the prospect was surrounded by several very productive oil and/or gas wells; 2) that all but one of these wells was a producer in the range of 200 or more barrels per day; 3) that they could expect the well to be drilled upon the Mikus lease to produce in excess of 200 barrels per day; and 4) that each of them would recover his investment within nine (9) months after the commencement of the sale of oil produced therefrom. They also alleged that Halamicek, a major shareholder in Enterprises, aided and abetted in the fraud perpetrated

on them by Enterprises, and is, therefore, also liable to them in damages.

The summary judgment rule, Rule 166–A, Texas Rules of Civil Procedure, states, in part:

"... The judgment sought shall be rendered forthwith if ... the moving party is entitled to judgment as a matter of law *on the issues as expressly set out in the motion* ..." (emphasis added).

Therefore, the only issues upon which the trial court could base the granting of summary judgment in favor of defendants, the movants, were those expressly raised in the motions filed by them. *City of Houston v. Clear Creek Basin Authority*, 589 S.W.2d 671 (Tex.1979). The motions filed by defendants were identical, except as to the movants' name. The motions stated the following grounds:

(1) there is no genuine issue of fact as to whether or not defendants made any direct representations to either plaintiff;

(2) there is no genuine issue of fact as to whether or not Johse was the agent [of defendants] to solicit investors in the well;

(3) there is no genuine issue of facts as to whether or not Johse solicited investments from the plaintiffs;

(4) there is no material issue of fact as to whether or not Johse made any guarantee to plaintiffs or made any misrepresentations to plaintiffs regarding the proposed Mikus well;

(5) there is no material issue of fact as to whether or not the plaintiffs relied upon representations made by Johse to make their decision to invest in the well; and,

(6) there is no material issue of fact as to whether or not any misrepresentations made by Johse, if made, were made wantonly, maliciously or willfully.

The purpose and intent of the summary judgment rule is not to deprive litigants of their right to a full conventional trial if there are any material questions of fact. *Gulbenkian v. Penn*, 151 Tex. 412, 252 S.W.2d 929 (1952). The question at both the trial and appellate court levels is whether the summary judgment proof establishes as a matter of law that there is no genuine issue of fact as to one or more essential elements of plaintiffs' cause of action. *Gibbs v. General Motors Corp.*, 450 S.W.2d 827 (Tex.1970).

■ In reviewing the granting of summary judgment, the appellate court is required to follow the following well established rules:

"(1) the movant for summary judgment has the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law;

(2) in deciding whether or not there is a disputed material fact issue precluding summary judgment, evidence favorable to the non-movant will be taken as true; and,

(3) every reasonable inference must be indulged in favor of the non-movant and any doubts resolved in his favor."

See *Wilcox v. St. Mary's University of San Antonio*, 531 S.W.2d 589 (Tex.1975). The trial court is not required to ascertain the credibility of affiants or to determine the weight of evidence in the affidavits, depositions, exhibits and other summary judgment proof. The only question is whether or not an issue of material fact is presented. *Gulbenkian v. Penn*, supra.

Two issues are presented in this appeal: *first*, is there a genuine issue of material fact as to whether Johse was the agent for the defendants in the transaction; *second*, if so, is there a genuine issue of material fact as to whether Johse made misrepresentations to each plaintiff which induced them to invest in the well. If it be determined that the summary judgment evidence shows conclusively that Johse was not the agent of defendants, the issue of misrepresentations by Johse, if he did misrepresent the facts, becomes moot. Therefore, we first determine whether there is a genuine issue of fact as to whether Johse was the agent of defendants.

It is conclusively established by the summary judgment evidence that neither of the defendants made any direct representa-

tions to either plaintiff. There was no personal contact or communication between either of the plaintiffs and either of the defendants until plaintiffs filed this suit. It is further conclusively established by the summary judgment evidence that there was no express agency relationship between either of the defendants, as principal, and Johse, as agent, for the raising of money needed to drill the Mikus well. It is undisputed: 1) that Enterprises expended $765,052.95 in the drilling of the Mikus well; 2) that Halamicek, as president of Enterprises, made a determination to seek outside investors to participate in the drilling of the Mikus well; 3) that each of the plaintiffs invested $10,000.00 in such operation; and 4) that outside investors invested a total of $500,000.00 in the well.

In response to the inquiry as to whether the defendants authorized Johse "to make a deal" with prospective investors, Halamicek, whose office was located in El Campo, Texas, in his deposition, testified:

"A   All right.  Kenneth (Johse) come up and said, 'Well, I have some investors, and it was in Wharton, that would like to get into it also.'  He was talking to Homer Taylor.  I was in there.  I said, 'Well, fine.'  And then he got to saying that they had to have so many in a group or something like that, wasn't it?  So many in a, you were only allowed 30 investors or something like that.  Some of them wanted to take 5,000, some ten, some seven-fifty, and Kenneth said, 'Well, I think I can make some groups up if you want me to,' and I said, 'Well, it is up to you, Kenneth.'"

Halamicek also said that he furnished Johse with certain forms to be used by him in the event any of the investors mentioned by Johse decided to invest in the drilling of the Mikus well.  The following questions and answers appear in Halamicek's deposition:

"Q   Other than the one conversation with Mr. Johse about this well that you described just a minute ago, did you and Mr. Johse ever have any other conversation about him obtaining investors in the well?

A   Well, I am sure that we talked off and on, you know.  He would say, 'Well, I have one or two,' or 'I have got some prospects,' or something.  They come and see me.  From what I understand, they came to see him.  That is what he told me, they came to his office wanting to inspect.  I don't think he went around soliciting no investors.

Q   Okay.  But you don't know?

A   No.  I didn't hire him to do so.  I didn't give him, I didn't tell him to do it, no.

Q   You didn't tell him to go out and solicit?

A   No.  I didn't tell him to go out and get any investors at all.

Q   Did you authorize him to receive or to talk to people about investing in the well?

A   He could do what he wanted to.  He took a part in it, too.  He lost $10,-000, also."

*       *       *       *       *       *

"Q   Okay.  My question is, were you aware, or were you not aware of the fact—

A   I wasn't aware of anything.  I wasn't aware of anything that Johse done, not a thing.  Not until—well, I will say, I wasn't aware at the time this was going on, no."

*       *       *       *       *       *

"Q   With regard to the Mikus well, wasn't Mr. Johse speaking for you."

A   No."

*       *       *       *       *       *

Halamicek, further stated that at the time in question, Johse, a "CPA," was the accountant for him and for Enterprises and had been such for about three years.  He also said that Johse has "an accounting practice where he has other clients."  Johse was not an employee of either defendant; he was not paid a retainer, but

from time to time sent "bills" to Halamicek and Enterprises for services rendered.

Johse testified by deposition. His office is located in Wharton, Texas. He stated that he was a certified public accountant and that he provided "accounting and tax services" for the defendants. In describing what occurred between him and the plaintiffs, he said it was agreed that a general partnership would be formed which would include the plaintiffs upon their payment of $10,000.00 each to him. Johse had the "partnership agreement drawn up." It was entitled "KRJ# 2," which consisted of seven partners, including the plaintiffs. Each person then paid $10,000.00 to Johse who, as trustee for the partnership, paid the aggregate sum of $70,000.00 to the defendants for a 7% interest in the working interest in the Mikus well. Johse further said that the KRJ# 2 partnership was never signed by any of the partners, because he "was waiting until the Mikus well came in before we sent around (sic) for all of the signatures."

Johse further testified that he learned from Halamicek that Enterprises desired to drill the Mikus well and wanted to sell interests in the working interest to investors at a price of $10,000.00 per 1% interest in the working interest. Johse, in his deposition, said:

"I told him (Halamicek) that if he was looking for investors in the well that I may know some people who might be interested. In my position as a CPA I have people who ask me all the time what can I do to lower my taxes, invest my money, so forth."

Johse, in response to certain questions asked when his deposition was taken, testified:

"Q  Did he (Halamicek) either say or somehow give you the impression that you were authorized to describe the prospects to other parties to see if they would be interested in investing?

  A  He told me that if I thought I knew some people who might be interested that that would be fine."

*     *     *     *     *     *

"Q  So when you started telling people about it and asking them if they wanted to invest you assumed that you had Mr. Halamicek's approval and authority to do so?

  A  Yes, sir."

*     *     *     *     *     *

"A  I agree that I had the authority to get investors; however, I was not, again, not hired to solicit. I might add that this was not any different than information I have come across my desk each month that investment houses and other companies are putting out information concerning investments, and I mention to clients, because I know some of them are interested in investments such as that or want to look at investments such as that."

*     *     *     *     *     *

Johse said that Halamicek did not promise him any compensation "for having talked to other investors," nor did he actually receive any such compensation. He also stated that the defendants did not hire him as their agent "to solicit investments" or to "get investors in this Mikus well."

According to Johse's deposition, he invested $10,000.00 in the Mikus well, and collected a total of $140,000.00 from several investors. He prepared two partnership agreements. One of them was composed of seven persons, denominated as KRJ # 2, noted above; none of the people constituting the KRJ # 2 group of investors were clients of Johse. Another partnership was prepared by Johse, and was denominated "KRJ # 1"; these investors were clients of Johse. All of the monies collected by Johse from the two groups of investors was promptly paid by him to Enterprises.

Johse did not contact either of the plaintiffs with respect to investing in the Mikus well. Instead, the plaintiffs contacted him and told him that they had heard that Enterprises intended to drill the Mikus well and wanted to sell interests therein to out-

side investors and that they were interested in possibly investing in the well. Johse said that, upon such inquiries, he furnished them all of the information which he had concerning the prospect, and that at a later date each of the plaintiffs gave him a check for $10,000.00 in payment for a 1% interest in the working interest in the well.

Both Hall and Chambers, in their affidavits which were attached to their response in opposition to the motions for summary judgment, in relevant part, stated:

\*   \*   \*   \*   \*   \*

"In approximately April 1982, I learned of Defendant F.A. HALAMICEK ENTERPRISES, INC.'S solicitation of investments in an oil and gas lease. I met on several occasions with Kenneth Johse, who explained F.A. HALAMICEK ENTERPRISES, INC.'S plan ..."

\*   \*   \*   \*   \*   \*

"Johse said he was Halamicek's CPA and that he was taking care of the investment 'on this side of the river.' He told me I could call Mr. Halamicek but that I would have better success in talking with him (Mr. Johse) because Mr. Halamicek had a speech impediment and was difficult to understand. Furthermore, Mr. Johse was in possession of charts, and maps on the well which indicated that he was acting on behalf of F.A. Halamicek Enterprises, Inc."

The plaintiff Chambers, in his deposition, testified:

"Q Did Mr. Johse ever approach you about a proposed investment in the oil and gas lease?

A No, sir.

Q Did you approach Mr. Johse?

A Yes, sir."

\*   \*   \*   \*   \*   \*

"Q And you went to him after you called him and made an appointment, I assume?

A Yes, sir.

Q Okay. Did you initiate the conversation at the appointment?

A Yes, sir.

Q What did you ask him, specifically?

A I just wanted some information on what did he know about the well that Mr. Halamicek was going to drill."

\*   \*   \*   \*   \*   \*

"Q Did Mr. Johse represent to you that he was an agent in Wharton for Frank Halamicek?

A He said that he was compiling a list of people that would be interested in investing in Mr. Halamicek's well, that he would be—I took it—he didn't tell me directly—I took it he would be in between man, between us and Mr. Halamicek.

Q You think he was employed by Mr. Halamicek to secure investors?

A Not to secure investors, I do not believe. I do not know one way or the other. I knew that he was his CPA."

\*   \*   \*   \*   \*   \*

The plaintiff Hall, in his deposition, testified:

"Q Where did you first learn that there was going to be a well drilled?

A Charles Chambers."

\*   \*   \*   \*   \*   \*

"Q What did Mr. Chambers tell you when he came to you about the oil proposal?

A Mr. Chambers told me that he had knowledge of this well to be drilled, and I asked him to tell me a little bit about it, and he said he really didn't know that much about it other than there was going to be a well drilled and referred me to Kenneth Johse.

Q All right. When he referred you to Kenneth Johse, did he mention the name of Frank Halamicek?

A Did Mr. Chambers mention that name?

Q Yes.

A I do not remember."

\*   \*   \*   \*   \*   \*

"Q So you went on your own because of the conversation with Mr. Chambers to see Mr. Johse?

A Yes.

Q To inquire about this particular investment?

A Yes.

Q What did Mr. Johse say to you in response to your inquiry into this investment?

A He told me that this well was to be drilled as described, in Lee County. That he was working with Mr. Halamicek and that the operator was going to be a man by the name of Tomlinson. And he talked to a man by the name of Brewer who he said was the geologist that said that it was an excellent location and opportunity for producing oil."

\* \* \* \* \* \*

"Q Okay. Did Mr. Johse in his conversation with you, represent himself to be an agent of Mr. Halamicek?

A He either said directly or implied that he was doing all of the dealings through him, because he was Mr. Halamicek's CPA and that he was taking care of this investment on this side of the river, as he said it, and that I could call any of these people. He told me, and I could call Mr. Halamicek but because of his speech impediment, I could better talk to Ken.

Q But he did not specifically say: I am agent of Frank Halamicek?

A I don't remember him saying those words, no, sir."

The summary judgment evidence shows conclusively that an agency relationship between the defendants, as principal, and Johse, as agent, was not established by any express agreement. Therefore, if an agency relationship did exist it had to arise by implication under the doctrine of "apparent authority."

■ Insofar as third persons are concerned, an agency may arise from the acts or appearances which reasonably lead third parties to believe that an agency in fact has been created. A third person who seeks to charge a principal through apparent authority (sometimes denominated as "implied authority") of an agent to bind the principal must prove such conduct on the part of the principal as would lead a reasonably prudent person to believe that the agent had the authority he purports to exercise. *Douglass v. Panama, Inc.*, 504 S.W.2d 776 (Tex.1974).

■ It has been held that "apparent authority" is based on estoppel, and this arises but from two sources: *first*, the principal may knowingly permit an agent to hold himself out as having the requisite authority, and in this way the principal becomes estopped to claim that his agent does not have such authority; *second*, the principal may, by want of ordinary care, so clothe the agent with indicia of authority as to lead a reasonably prudent person to believe that he actually has such authority. *Great American Casualty Co. v. Eichelberger*, 37 S.W.2d 1050 (Tex.Civ.App.— Waco 1931, writ ref'd). See 3 Tex.Jur.3d, Agency, §§ 47–51.

■ In order to establish an agency by estoppel, two elements must be established: *first*, the principal must have held the agent out in other instances, or in the particular transaction, as possessing authority sufficient to embrace the particular act in question, or he must have knowingly acquiesced in the agent's assertion of requisite authority; *second*, the person dealing with the agent must have relied on the conduct of the principal to his prejudice. *National Cash Register Co. v. Wichita Frozen Food Lockers, Inc.*, 172 S.W.2d 781 (Tex.Civ.App.—Fort Worth (1943), aff'd 142 Tex. 109, 176 S.W.2d 161 (1944)). Without the principal's participation, either through his acts or knowledge of, and acquiescence in those of the agent, no mere combination of circumstances which may mislead persons into a false inference of authority, however reasonable, will serve as a predicate for apparent authority. *Douglass v. Panama, Inc.*, supra.

There is no material issue of fact as to whether Johse was the agent of the defendants. It is undisputed that such a relationship was not created by express agreement. There is no legal basis for our holding that a material issue of fact exists as to whether such a relationship may have been created under the doctrine of apparent authority. Considering the evidence most favorably to plaintiffs, indulging every inference in their favor, and resolving all doubts in their favor, we hold that the summary judgment evidence conclusively shows that Johse did not represent to plaintiffs or do anything which could have led plaintiffs to believe that he was acting as defendants' agent in the transaction. It is undisputed that the plaintiffs contacted Johse for the express purpose of obtaining information in order that each could decide for himself if he desired to invest in the well. Johse complied with the request and exhibited to them all of the information which he had in his possession. It is further conclusively shown that Johse did not solicit either of the plaintiffs to invest in the well. To the contrary, each plaintiff sought out Johse, and after having been given the pertinent technical information as to the prospects, on his own volition, invested in the well.

The statements made by each plaintiff in his affidavit concerning the asserted agency and the answers of each to questions propounded to each in the depositions, hereinbefore quoted, constitute the only evidence relating to the issue of agency under the doctrine of apparent authority. Those statements and answers are too indefinite and uncertain to be considered as any evidence that the plaintiffs were misled into reasonably believing that defendants held Johse out to them as their agent, and thus raised a genuine issue of material fact as to whether Johse was the agent for the defendants in the matter.

In view of our holding that there is no issue of material fact presented concerning the alleged agency issue, there is no need for us to determine whether there is an issue of material fact as to whether Johse made misrepresentations of material fact to plaintiffs, if he did make any representations, and that they relied thereon to their detriment. The trial court correctly and properly rendered summary judgment in favor of each defendant.

The judgment of the trial court is AFFIRMED.