**CHEROKEE WATER COMPANY, Appellant,**

v.

**Martha Paul Rogers FORDERHAUSE, et al., Appellees.**

No. 9502.

Court of Appeals of Texas, Texarkana.

Feb. 10, 1987.

Rehearing Denied March 4, 1987.

John W. Stayton, Jr., McGinnis, Lochridge & Kilgore, Austin, Gordon Wellborn, Wellborn, Houston, Adkison, Mann & Sadler, Henderson, for appellant.

T.A. Bath, Bath, Turner & Barber, Henderson, D.L. Case, Jackson, Walker, Winstead, Cantwell & Miller, Dallas, for appellees.

GRANT, Justice.

Cherokee Water Company appeals from an adverse judgment in which Forderhause, et al prevailed in a jury trial by obtaining reformation of an option clause contained in a deed. This cause was severed from an original suit for which the opinion is found in 623 S.W.2d 435 (Tex.Civ. App.—Texarkana 1981), and the reversal by the Texas Supreme Court is found in 641 S.W.2d 522 (Tex.1982).

In the original suit, the Supreme Court determined that the language of the deed was not ambiguous and that an oil and gas lease was within the scope of the language providing for a preferential right to purchase. The Supreme Court determined that the use of the word "sale" encompassed what is sometimes referred to as a "lease" of the minerals, because the common oil and gas lease creates a determinable fee and vests the lessee with title to the oil and gas in place.

The language in controversy in the deed is as follows:

> Grantee is hereby given the first option to purchase the oil, gas and other minerals herein reserved, at the same price and on the same terms as Grantor has agreed to sell to a third party; such option to be accepted or rejected within five (5) days after Grantee has been furnished with the bona fide offer made by such third party. Failure to exercise such option on one sale, shall not be a waiver to purchasing at any subsequent sale or sales by Grantor.

At the time of the transaction in question, a tract of 59.71 acres in Rusk County was owned jointly by three brothers and their wives, Mr. and Mrs. C.E. "Shot" Rogers, Mr. and Mrs. Paul Rogers, and Mr. and Mrs. J.E. Rogers, who will collectively be referred to as the Rogers brothers (which includes their wives). The appellees are Martha Paul Rogers Forderhause, Mrs. J.E. (Fairy) Rogers, individually and executrix of the estate of J.E. Rogers, deceased, Glenn W. Rogers, and Doris Rogers Walters. Cherokee Water Company, appellant, will be referred to as Cherokee.

In the summer of 1947, Clyde Hall, accompanied by some other men, talked to C.E. "Shot" Rogers about the plan to purchase the land to build a lake. According to the testimony of "Shot" Rogers's son, the men appealed to "Shot" Rogers to "sell it [the land] on the ground of civic improvements and this sort of thing." Rogers told them that he was not interested in selling, and that his brothers probably were not interested either.

On August 19, 1947, the three brothers and their wives met G.W. Sharp at "Shot" Rogers's store in the Stewart community of Rusk County. After a discussion between Sharp and the Rogers brothers, which lasted approximately an hour, the Rogers brothers signed a form deed conveying the property to Clyde H. Hall, trustee.

On February 15, 1949, Hall, as trustee, assigned Cherokee the land which the Rogers brothers had conveyed to Hall as trustee, together with the lands covered by 166 similar deeds. The assignment recites that the lands had been purchased by Clyde H.

Hall, trustee, "for the benefit of Cherokee Water Company," and the assignment is made "without covenants of warranty either expressed (sic) or implied for the reason that this deed purports to convey only the rights, titles, and interests acquired by the said Clyde H. Hall, Trustee, by virtue of the above-described conveyances."

On June 29, 1950, the Rogers brothers executed an oil and gas lease to Atlantic Refining Company covering the property in question. They did not give Cherokee a first right of refusal, nor did they notify Cherokee of the transaction. Fairy Rogers testified that this was because they did not think they were required to do so. After the expiration of the lease to Atlantic, the Rogers brothers executed an oil and gas lease to E.S. Boase and Neil Woods on December 27, 1976. On February 24, 1978, the Rogers brothers were notified by Cherokee's attorney that Cherokee was entitled to first refusal rights to purchase the minerals on the same terms as the Rogers brothers had elected to sell to a third party, and that the failure of the Rogers brothers to notify Cherokee before leasing to Boase and Woods was in violation of Cherokee's preemptive rights to purchase the minerals. A suit was then brought by Cherokee against the Rogers brothers for specific performance of the option clause. The Rogers brothers brought a counterclaim for reformation of the deed, and the trial court severed their claim. That severed counterclaim is the case before us at this time.

The case went to the jury on three issues.[1] The jury found that G.W. Sharp

---

1. The special issues that went to the jury are as follows:

SPECIAL ISSUE NO. 1

Do you find that, in securing the agreement of Grantors to sell to Grantee the property described in the Deed in question and in securing the execution and delivery by Grantors of such Deed, G.W. Sharp was acting for and on behalf of Clyde Hall, Trustee, and with actual or apparent authority to negotiate and enter an agreement with Grantors?
Answer "We do" or "We do not."
ANSWER: _____
In connection with Special Issue No. 1, you are instructed that actual authority can be

express or implied. Express authority is that authority which is expressly stated in the agreement between the agent and principal. Implied authority is that authority necessary to carry out the acts expressly authorized or reasonably inferred by the agent from the express terms of the agreement.

You are further instructed that apparent authority may arise only from a principal knowingly permitting an agent to hold himself out as having that authority or from the principal's actions which, because they lack ordinary care, clothe the agent with evidence of that authority, thus leading a reasonably

was acting for and on behalf of Clyde Hall, trustee, when he secured the agreement of the Rogers brothers to sell the property to the trustee of Cherokee. The jury further found that before the signing of the deed in question, the parties to the deed had made an agreement that the first option clause of the deed would not include leases of oil, gas and other mineral interests. The third finding of the jury was that the failure of the option clause to expressly exclude leases of oil, gas and other minerals was the result of a mutual mistake as to the legal effect of the language used in the first option clause.

Cherokee raises twelve points of error, contending as follows: (1) that the trial court erred in excluding evidence of the Rogers family's experience in land transactions; (2) that the trial court erred in admitting evidence of Cherokee's non-exercise of its first refusal option many years after the execution of the deed and by admitting an agreement made in 1977 between Cherokee and Eagle Energy Group concerning the future exercise of the option, because this evidence was irrelevant and was prejudicial; (3) that the trial court erred in not granting Cherokee's motion for judgment non obstante veredicto and to disregard the answers to the special issues, because Cherokee was a bona fide purchaser for value; (4) that the trial court erred in entering a judgment against them because there was insufficient evidence or no evi-

dence to support the jury's answer to each of the special issues; (5) that the trial court erred in submitting special issues two and three, because those issues did not correctly submit the elements of mutual mistake which would entitle a party to reformation; (6) that the trial court erred in admitting hearsay evidence. We address these points in the order set forth above.

■ Cherokee sought to introduce evidence that Fairy Rogers and her husband were experienced in land transactions at the time of the 1947 deed. Cherokee proposed to introduce twenty-three recorded instruments evidencing real estate transactions involving Mr. and Mrs. Rogers. The trial court sustained an objection that these exhibits were not relevant. Cherokee contends that the evidence was relevant on the issue of whether or not there was a mutual mistake in connection with the execution of the deed and that these exhibits would have benefited the jury in weighing the credibility of Fairy Rogers' testimony. Fairy Rogers had testified that she and her husband had "bought land, sold land and kept minerals and let minerals go." She had not denied that she and her husband had been involved in land transactions involving minerals. Therefore, the introduction of the deeds of prior transactions was not in the nature of impeachment and was cumulative of the earlier testimony. Thus, we find no error.

prudent person to believe that the agent has the authority he purports to exercise.

If you have answered "We do" to Special Issue No. 1, then proceed to Special Issue No. 2. If you have answered "We do not" to Special Issue No. 1, then do not answer Special Issue No. 2.

SPECIAL ISSUE NO. 2

Do you find that, before the signing of the Deed in question, Grantors and Grantee had made an agreement that the first option clause of such Deed would not include leases of oil, gas and other mineral interests?

Answer "We do" or "We do not."

ANSWER: _____

In connection with Special Issue No. 2, you are instructed that, as a matter of law, an oil and gas lease is a sale of interest in land and that a lease for oil, gas and other minerals was, as a matter of law, covered and included in the first option clause of the Deed in question.

If you have answered "We do" to Special Issue No. 2, then proceed to Special Issue No. 3. If you have answered "We do not" to Special Issue No. 2, then do not answer Special Issue No. 3.

SPECIAL ISSUE NO. 3

Do you find that the failure of the first option clause of the deed in question to expressly exclude leases of oil, gas and other mineral interests was the result of a mutual mistake as to the legal effect of the language used in such first option clause?

Answer "We do" or "We do not."

ANSWER: _____

In connection with Special Issue No. 3, you are instructed that "mutual mistake" means a mistake that was common to the parties on both sides of the Deed in question, with all of those parties laboring under the same misconception.

Cherokee further contends that the trial court erred in admitting evidence concerning the Eagle Energy Group. In 1977, Ray B. Powers, Jr. was an independent landman in East Texas and was working on behalf of Hunt Oil Company in the Rusk and Gregg County area. He discovered the numerous conveyances to Clyde H. Hall, trustee, which contained the grantee's first right of refusal in the event the grantor decided to sell the minerals. After terminating his employment with Hunt Oil Company, Powers and his partners (calling themselves Eagle Energy Group) entered into an agreement with Cherokee whereby if Cherokee acquired any leases as a result of its exercise of the preferential right, the working interest would be assigned to Eagle Energy Group, with Cherokee receiving an overriding royalty and bonus. Between 1947 and 1977, before the agreement between Cherokee and Eagle Energy Group, Cherokee had exercised its right of first refusal only on one occasion. Evidence was also introduced that Cherokee was prosecuting this litigation under the Eagle-Cherokee agreement. This evidence does no more than show Cherokee's interest in obtaining the leases. Cherokee is not involved in mineral development, but by the terms of the transaction with Eagle, Cherokee could obtain benefits including an overriding royalty by obtaining the leases and assigning them to Eagle.

 Evidence regarding Cherokee's failure to exercise its right of the first refusal for thirty years and the role played in this litigation by Eagle Energy Group was admissible to show the entire circumstances involved, including Cherokee's attitude and understanding of the right of first refusal provision in the contract. As pointed out by the court in *State v. Wales*, 271 S.W.2d 728 (Tex.Civ.App.—Beaumont 1954, writ ref'd n.r.e.), "Mutual mistake, where a controversy goes to the courts, will not be readily established by the admissions of the parties to be affected by the reformation of a deed or contract. Like a conspiracy a

mutual mistake is generally established from facts and circumstances surrounding the parties." The determination of reformation cases depends upon the facts of each particular case, such as, the nature of the mistake, the action of the parties in dealing with the property after the mistake has occurred and similar matters. *Clopton v. Cecil*, 234 S.W.2d 251 (Tex.Civ.App.—San Antonio 1950, writ ref'd n.r.e.).

Cherokee also argues that because there was no evidence that Cherokee was not a bona fide purchaser for value, the appellees were not entitled to reformation. The gist of this argument is that there was no evidence that Cherokee purchased the property from Hall with notice of the mistake. An examination of the relationship of Hall to Cherokee is important not only for this issue, but as it relates to other issues which follow. The corporate minutes of Cherokee show that Hall was appointed as an attorney for the corporation. Other minutes in evidence show him to continue in his activities as Cherokee's attorney in being authorized to file suits to condemn land for building of the lake, and the record also contains the pleadings from some of the suits which he filed as attorney for Cherokee. The record also reflects that he was authorized to sign corporate checks for the purchase of the land for building the lake.

The land from the Rogers brothers was deeded to Hall as trustee. When the land was deeded from Hall to Cherokee, the deed stated that the land "was purchased and acquired for the benefit of Cherokee Water Company." The deed further states that, "The said Cherokee Water Company, in consideration of this conveyance, assumes and takes over all the obligations imposed upon Clyde H. Hall, Trustee, by virtue of any and all of the above mentioned deeds and agrees to hold him harmless from any cause of action or damages caused by the reason of having taken any of such deeds." [2] A demand letter in evidence from Cherokee to Fairy Rogers rec-

---

**2.** The deed goes on to say, "... so that there shall not be imposed upon said Cherokee Water Company the same obligations that have heretofore been imposed upon Clyde H. Hall, Trustee."

It appears from the context that the word "not" is a typographical error and should be "now." The exhibit in evidence underlines the "t" in the word "not."

ognizes her "as a mineral owner of land acquired by Cherokee Water Company *through* Clyde H. Hall, Trustee." (Emphasis added.) Clyde Hall's secretary offered testimony verifying Hall's work for Cherokee. Also Perry Thompson testified that he was employed by Vernon Clement (an initiator of the Cherokee project) to work with Clyde Hall and Hamp Smead as attorneys for the Water Company for purposes of surveying the land being acquired by Cherokee. He indicated that Hall had a lot of landmen working out of his office acquiring the property and that his crews worked with Hall and the landmen.

■ The fact that Hall is called a trustee in the deed does not prevent a determination that he was in fact an agent. George G. Bogert & George T. Bogert, *Handbook of the Law of Trusts* § 16, at 36 (5th ed. 1973), citing *Viser v. Bertrand*, 16 Ark. 296; *Rowe v. Rand*, 111 Ind. 206, 12 N.E. 377 (1887). Furthermore, it is possible for the role of trustee and agent to coexist.[3] Hall may have held title for Cherokee as its trustee, yet functioned as an agent for Cherokee. The fact that he was employed by Cherokee and that Cherokee, according to the deed, did not intend for him to incur any personal responsibilities to third persons for his acts are indicia of a principal/agency relationship. Furthermore, the specific language in the deed confirms that Cherokee intended to be placed in the same position for all purposes as Hall and specifically excludes any warranty from Hall. Under these circumstances, we find that a conveyance from Hall as Cherokee's trustee/agent cannot qualify Cherokee as a bona fide purchaser for value free from all equitable claims.[4]

Cherokee contends in seven points that there was insufficient evidence or no evidence to support the jury's answers to the special issues. In reviewing a "no evidence" point, we consider only the evidence tending to support the finding, viewing it in the light most favorable to the finding, giving effect to all reasonable inferences therefrom, and disregarding all contrary and conflicting evidence. *Glover v. Texas General Indemnity Co.*, 619 S.W.2d 400 (Tex.1981). "Insufficient evidence" points require that we consider and weigh all the evidence. *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660 (1951).

Several of these no evidence and insufficient evidence points hinge upon Sharp's role in the transaction and the sufficiency of the evidence to establish that Sharp was an agent of Hall (which in turn would make him a subagent of Cherokee since Hall was involved in the purchasing on Cherokee's behalf). There are a number of Texas cases that indicate that the principal is bound by a mistake between the agent and a third party as to the terms of a contract. *State v. Wales, supra; Hutchins v. Birdsong*, 258 S.W.2d 218 (Tex.Civ.App.—Texarkana 1953, writ ref'd n.r.e.); *Merchants'*

---

3. For example, the general rule is that property purchased by an agent in his own name and with the principal's money is held by the agent in trust for the principal. 3 Tex.Jur.3d *Agency* § 119 (1980).

4. No issue was submitted to the jury concerning the agency relationship of Hall to Cherokee. No point of error is made on the failure to submit this matter to the jury. The appellate courts in Texas have split on whether the existence of an agency relationship is a question of law or a question of fact. Some appellate courts hold that it is a question of law to be determined solely by the trial judge, in light of the relations of the parties under the agreement between them or in view of their acts and conduct. *Cain v. Tennessee-Louisiana Oil Co.*, 382 S.W.2d 794 (Tex.Civ.App.—Tyler 1964), *aff'd*, 400 S.W.2d 318 (Tex.1966); *State v. Keeton Packing Co.*, 487 S.W.2d 775 (Tex.Civ.App.—Fort Worth 1972, no writ); *Somerville v. Smith*, 200 S.W.2d 242 (Tex.Civ.App.—Fort Worth 1947, no writ); *Daugherty v. Wiles*, 207 S.W. 900 (Tex. Comm'n App.1919, opinion adopted); 3 Tex. Jur.3d *Agency* § 259 (1980). Other courts hold that the question of agency is one of fact. *Horne v. Charter National Insurance Co.*, 614 S.W.2d 182 (Tex.Civ.App.—Fort Worth 1981, writ ref'd n.r.e.); *American Transfer and Storage Co. v. Reichley*, 543 S.W.2d 162 (Tex.Civ. App.—Amarillo 1976, no writ); *Foundation Reserve Insurance Co. v. Wesson*, 447 S.W.2d 436 (Tex.Civ.App.—Dallas 1969, writ ref'd). (For other cases see 42 West's Texas Digest 2d *Principal and Agent* § 24 (1984)).

In the present case, the trial court had a right to conclude as a matter of law that Cherokee undertook all obligations and liabilities of Hall involved in the acquisition of the land, because of the specific language in the deed from Hall to Cherokee.

*& Manufacturers' Inter-Insurance Alliance v. Hansen*, 258 S.W. 257 (Tex.Civ. App.—Dallas 1924, writ dism'd).

As in many cases involving agency, there is no direct testimony as to what authority was delegated to Sharp. There is no written instrument in evidence granting or limiting the authority of Sharp. Mrs. Martha Dickerson, Hall's secretary at the time of the transaction in question, testified that Sharp was engaged in "doing business for" Hall by "talking to the landowners" whose property was needed for the Lake Cherokee project. The testimony of Perry Thompson, who had been the surveyor for the lake project, indicated that Hall had engaged a number of landmen to assist him in dealing with the numerous landowners, and that each deal has to be worked out individually. There had been no agreement reached with the Rogers brothers prior to Sharp's visit. Ray Powers, involved with the Eagle Energy Group, testified that one of the ordinary duties of a landman is to negotiate with the landowners.

■ The general rule is that an agency relationship may not be shown merely by declarations or statements of the alleged agent. *McAfee v. Travis Gas Corp.*, 137 Tex. 314, 153 S.W.2d 442 (1941). However, such testimony can be admitted in order to corroborate other testimony. *Car Ltd. v. Smith*, 590 S.W.2d 738 (Tex.Civ.App.— Houston [14th Dist.] 1979, writ ref'd n.r.e.).

■ Agency may be established by circumstances, such as the relation of the parties and their conduct concerning the transaction in controversy. *Union Producing Company v. Allen*, 297 S.W.2d 867 (Tex.Civ.App.—Beaumont 1957, no writ); *Moore v. El Paso Chamber of Commerce*, 220 S.W.2d 327 (Tex.Civ.App.—El Paso 1949, writ ref'd n.r.e.); *Stripling v. Hoing*, 203 S.W.2d 1016 (Tex.Civ.App.—Fort Worth 1947, no writ); *Wardlaw v. Pace*, 66 S.W.2d 350 (Tex.Civ.App.—Eastland 1933, no writ).

■ It is undisputed that Sharp was sent out by Hall to secure signatures on the deeds. Hall, and later Cherokee, accepted the executions of the deed which Sharp had obtained through his negotiations. It is a principle of the highest form of justice that a principal will not be permitted to keep and enjoy the benefits arising from a repudiated agency without assuming the burdens imposed by the agency. *D. Sullivan & Company v. Ramsey*, 155 S.W. 580 (Tex.Civ.App.—San Antonio 1913, no writ). One cannot accept the benefits of his agent's alleged unauthorized act in procuring a signature to an agreement without at the same time being responsible for the methods used in obtaining the signature. "One cannot blow hot and cold at the same breath." *Attaway v. Ellis*, 173 S.W.2d 367 (Tex.Civ.App.—Texarkana 1943, no writ). The record indicates that there was a strong insistence by the Rogers that the instrument not affect their right to lease the minerals. They were induced to sign the document on the basis that their right to lease the minerals would not be affected. Having accepted the benefits under the deed, Cherokee should not be allowed to reject the negotiation of their agent in obtaining these benefits.

Cherokee contends that Sharp had no authority to negotiate the terms of the contract, but rather was sent to solicit signatures on the printed deeds, and that he had neither implied authority nor actual authority to negotiate the terms for entering into any agreements other than those on the printed form.[5] Certainly the jury could infer that incidental to Sharp's duties in obtaining signatures from the mineral owners was the duty to explain the nature of the instrument which he sought to get signed. His principal could not have reasonably expected him to remain silent.

■ Furthermore, in the absence of any showing to the contrary, an agency is presumed to be general. *Hearn v. Hanlon-Buchanan, Inc.*, 179 S.W.2d 364 (Tex. Civ.App.—Fort Worth 1944, writ ref'd w.o.

**5.** The testimony indicated that the deeds were on printed forms with the blanks already filled in by a typewriter.

m.); *Barker v. Mosby*, 118 S.W.2d 946 (Tex.
Civ.App.—Austin 1938, writ dism'd); *Oliver Farm Equipment Sales Co. v. Martin*,
68 S.W.2d 333 (Tex.Civ.App.—El Paso
1934, no writ). An agent's authority is also
presumed to be coextensive with the business entrusted to his care. *Jarbe Oil Company v. Birdwell & Son Drilling Co.*, 335
S.W.2d 394 (Tex.Civ.App.—Eastland 1960,
writ ref'd n.r.e.). For Sharp, this was the
purchasing of real estate at the lake site.

Cherokee also contends that the doctrine
of apparent authority cannot apply to this
case, because as a general rule the doctrine
has no application to transactions involving
real estate. *Bugh v. Word*, 424 S.W.2d 274
(Tex.Civ.App.—Austin 1968, writ ref'd n.r.
e.); *Goode v. Westside Developers, Inc.*,
258 S.W.2d 844 (Tex.Civ.App.—Waco 1953,
writ ref'd n.r.e.). The appellees contend
that this doctrine applies only to licensed
real estate agents. However, the court in
*Huginnie v. Loyd*, 483 S.W.2d 696 (Tex.
Civ.App.—Tyler 1972, writ ref'd n.r.e.),
held that this rule applies to any agent who
is involved in a transaction for the sale or
conveyance of land and is not limited to
licensed real estate agents or brokers.

The jury in the present case was instructed not only concerning apparent authority,
but also as to express or implied actual
authority. We have found that the circumstantial evidence is sufficient for a finding
of actual and implied authority.[6] Therefore it is not necessary to address the issue
of apparent authority.

We also find that the record contains sufficient evidence that Sharp's
agreement with the Rogers brothers excluded mineral leases and of Sharp's mistaken belief that the option clause did not
refer to mineral leases.[7]

Fairy Rogers testified that she "knew
that whenever you leased the land it comes
back to you. If you sell it, I mean the
lease, it comes back to you. If you sell the
land, it is gone." The testimony explains
her concept of the word *lease* as opposed to
a *sale* of the minerals. Sharp had assured
her and the other sellers that this was a
proper interpretation. The testimony thus
indicates that the negotiation did not occur
by using the legal terminology of *determinable fee* and *fee simple absolute* in
discussing the ownership rights proposed
to be purchased, but rather the matter was
discussed in layman's terms. The language of the instrument lends itself to
misinterpretation by laymen, who generally
do not think of the term *sale* as encompassing the term *lease*. It is proper to look to
the intentions of the parties at the time of

**6.** An agent has by implication all powers necessary and proper to accomplish the purpose for which the agency was created. *Houston Packing Co. v. Spivey*, 333 S.W.2d 423 (Tex.Civ.App. 1960, no writ). Implied powers are those incidental to powers expressly given to effectuate the purpose of the express powers conferred. *First Texas Joint Stock Land Bank v. Holloway*, 77 S.W.2d 301 (Tex.Civ.App.—Amarillo 1934, no writ).

**7.** Fairy Rogers testified concerning statements made by Sharp prior to the execution of the deed by the Rogers brothers as follows:

Q Now, let me ask you this. Did Mr. Sharp, in your presence, say anything about whether what you've just read to the Jury did or did not apply to oil and gas leases?
A He said we could lease it when we wanted to—any time we wanted to to anybody. He said that [referring to the option clause in the lease which she had just read] didn't apply to it, and we taken it that way because we had a chance to lease several times and we didn't ask them because we didn't think we had to ask them.
. . . .

Q Did you folks tell Mr. Sharp anything about the sale of minerals, whether or not you intended to sell the minerals?
A Oh, yes. We told him we never aimed to sell them throughout our lifetime. It was ours to keep, never to sell. We didn't want to sell them to Cherokee Water Company or anybody else. We were just keeping them to lease.
Q All right. What, if anything, did you say about wanting to lease the property? What did you tell Mr. Sharp about that?
A Well, we wanted to lease it, of course. We'd love to lease it.
Q And do I understand that he told you that what you read to the Jury wouldn't affect that right?
A Right.
. . . .
Q After that discussion, did you folks sign your names to this deed?
A Yes, sir.

the execution to determine the true agreement.

The statements by Sharp could be construed to be fraudulent if Sharp had been knowledgeable of the falsity of his statements in declaring that leases were not covered by the deed, but the jury determined that Sharp also was mistaken in his interpretation. Sharp's mistake as an agent is imputed to the principal and he is bound thereby. *Merchants' & Manufacturers' Inter-Insurance Alliance v. Hansen, supra; North Texas Oil & Refining Company v. Standard Tank Car Company,* 249 S.W. 253 (Tex.Civ.App.—San Antonio 1923, writ dism'd).

Cherokee contends that there is no showing that all of the grantors on the deed were mistaken, but we believe this to be a reasonable inference, because all of the Rogers brothers and their wives were at the discussion prior to the execution, and Fairy Rogers' testimony indicates that she is testifying as to the position of all of the Rogers brothers. Her testimony uses the plural "we" and "ours" in her testimony concerning the statements made to Sharp.

■ Cherokee contends that the trial court erred in admitting hearsay evidence concerning statements made by G.W. Sharp about the transaction or agreement between the Rogers brothers and Hall. We have determined that the evidence as

well as the jury findings indicate that Sharp was an agent acting within the scope of his employment at the time of the negotiations and transactions to which Fairy Rogers testified. Therefore, this testimony is admissible pursuant to Rule 801(e)(2)(D) of the Texas Rules of Evidence which states that

A statement is not hearsay if ... the statement is offered against a party and is ... a statement by his agent or servant concerning a matter within the scope of his agency or employment, made during the existence of the relationship.

Furthermore, the testimony is admissible to show the operative acts constituting the mutual mistake.[8] The statements were not introduced to show the truth of the matter stated, because the gist of the statements was to the effect that the written document did not cover mineral leases. The plaintiffs were seeking to show that this was not true and therefore was a mutual mistake. This was essentially a part of the offer and acceptance of the contract which constitutes operative facts and not hearsay.[9] *Yellow Freight System Inc. v. North American Cabinet Corp.,* 670 S.W.2d 387 (Tex.App.—Texarkana 1984, no writ). The agreement as to what the sale included was certainly a part of the terms of the offer and acceptance. The negotiations and the true agreement go to the very essence of

---

8. Because this is an action in reformation, the parol evidence rule does not exclude testimony that shows the mutual mistake which is alleged and that the written agreement does not reflect the true agreement of the parties. *State v. Wales, supra; De Flores v. Smith,* 236 S.W. 505 (Tex.Civ.App.—San Antonio 1921, writ dism'd).

9. The definition in Tex.R.Evid. 801(c) seems to have caused some confusion for the dissent: "Matter asserted" includes any matter implied by a statement, if the probative value of the statement as offered flows from declarant's belief as to the matter.

The Drafters' Comment offers four examples of hearsay under this definition. One example involves an explicit assertion offered to prove the matter asserted. One example deals with non-verbal assertive conduct. The third example is non-assertive verbal conduct offered for the truth of the matter implied. This is illustrated in the comment by the declarant making the out-of-court statement, "Open the door, Rich-

ard." The statement implies that the declarant believed Richard was in the room. It would be inadmissible to prove Richard was in the room.

The other example used by the drafters is a verbal explicit assertion offered for the truth of the matter implied by the statement. The illustration used is similar to the fact situation in *Phoenix Refining Co. v. Walker,* 108 S.W.2d 323 (Tex.Civ.App.—Beaumont 1937, writ dism'd). The only known remedy for X disease is medicine Y, and the only known use of medicine Y is to cure X disease. To prove that a person had X disease, the witness testified that the declarant doctor had stated that the best medicine for the person was Y. This would be an implication flowing from the declarant's belief as to the matter, and thus would be inadmissible.

These examples are not applicable to the situation in the present case. Rule 801(c) was not intended to exclude the terms of a contract, when they are at issue in a case, nor does it exclude statements which show intent, when intent is an issue to be resolved.

the cause of action in this case and are admissible.[10] *Olvey v. Jones,* 137 Tex. 639, 156 S.W.2d 977 (Tex.Comm'n App.1941, opinion adopted); *Pegues v. Dilworth,* 134 Tex. 169, 132 S.W.2d 582 (Tex.Comm'n App.1939, opinion adopted).

Furthermore, these statements were admissible to reflect the state of mind of the declarant which could be either non-hearsay or fall within the state of mind exception to show intent. *Reserve Life Insurance Co. v. Goodloe,* 316 S.W.2d 443 (Tex. Civ.App.—Waco 1958, writ ref'd n.r.e.); Tex.R.Evid. 803(3).

Cherokee complains that special issues two and three did not correctly submit the elements of mutual mistake which would entitle the appellees to reformation of the deed. The elements established by these issues were that an agreement was made, that the option clause contained in the deed would not include mineral leases and that the failure of the deed to expressly exclude mineral leases was the result of a mutual mistake as to the legal effect of the language used.

Texas, as well as most other states, has followed the rule laid down in *Bilbie v. Lumley,* 2 East 469, 102 Eng.Rep. 448 (1802), which established the doctrine of "ignorantia juris non excusat." Only the states of Kentucky and Connecticut refused to follow this dogma. Smith, *Correcting Mistakes of Law in Texas,* 9 Texas L.Rev. 309 (1931).

Because of the legal maxim that ignorance of the law is no excuse, the courts have sometimes arrived at strained interpretations and distinctions when reviewing claims of mistake in an effort to reach a just result.[11] In Texas there is a presumption that contracting parties are knowledgeable of the law and contract accordingly. This is a rule applicable to the interpretation of contracts. However in reformation cases, it should make no difference whether the mistake is called a mistake of fact or mistake of law. *Brinker v. Wobaco Trust Ltd.,* 610 S.W.2d 160 (Tex.Civ.App.— Texarkana 1980, writ ref'd n.r.e.); *see also* 3 A. Corbin, *Corbin on Contracts* § 616 at 754, § 619 at 769 (1960).[12]

██ If the parties are mutually mistaken with respect to the legal effect of the language that they have used, the writing should be reformed to reflect the intended effect.[13] A contract, the making of which is induced by mistake as to the legal effect of the words in which it is expressed, should be rescinded or reformed. 3 A.

---

**10.** Such representations are sometimes referred to as res gestae. 3 Tex.Jur.3d *Agency* § 244 (1980).

**11.** An often quoted example of distinguishing between mistakes of fact and mistakes of law originated in *Eaglefield v. Marquis of Londonderry,* [1876] L.R. 4 Ch.D. 693, 702, as quoted in Smith, *Correcting Mistakes of Law in Texas,* 9 Texas L.Rev. 309, 318 (1931), which states:

> Suppose a man is asked by a tradesman whether he can give credit to a lady and the answer is "you may, she is a single woman of large fortune." It turns out that the man who gave that answer knew that the lady had gone through the ceremony of marriage with a man who was believed to be a married man, and that she had been advised that that marriage ceremony was null and void, though it had not been declared so by any court, and it afterward turned out that they were all mistaken, that the first marriage of the man was void, so that the lady was married. He does not tell the tradesman all these facts, but states that she is single. That is a statement of fact. If he had told him the whole story and all the facts and said "now, you see, the

lady is single" that would have been a misrepresentation of law.

**12.** Corbin recognizes that the law is not written in shining letters against the sky and that sometimes even the courts do not agree on its application (as was demonstrated in the opinions of the courts in the case from which the case at bar was severed). 3 A. Corbin, *Corbin on Contracts,* § 616 (1960).

**13.** The American Law Institute Restatement of the Law on Contracts no longer makes the distinction of whether a mistake is one of law or one of fact. The section applicable to the present fact situation reads as follows:

> Where a writing that evidences or embodies an agreement in whole or in part fails to express the agreement because of a mistake of both parties as to the contents or effect of the writing, the court may at the request of a party reform the writing to express the agreement, except to the extent that rights of third parties such as good faith purchasers for value will be unfairly affected.

Restatement (Second) of Contracts § 155 (1979).

Corbin, *Corbin on Contracts* § 619 at 769 (1960).

Texas has created many exceptions to the rule that ignorance of the law is no excuse, e.g., relief is available when the mistake is a mistake as to foreign law, or as to mixed law and fact, or where the mistake is as to private legal rights and not a mistake as to the general rules of law.

In the case of *Moore v. Studebaker Bros. Mfg. Co.*, 136 S.W. 570 (Tex.Civ.App. 1911, no writ), the court held that relief would be denied where the plaintiff's case "rests upon his being mistaken only as to the legal effect of the terms employed in the contract, and not the language of the contract itself." However, in *North Texas Oil & Refining Co. v. Standard Tank Car Co., supra,* the court held that a party to the contract could show that certain words interpolated into the contract were intended to exempt the stockholders from personal liability, though in legal contemplation the words had no such effect. The court made the following determination:

> If the expressions used did not in fact operate to so exempt the shareholders, then the parties were mutually mistaken as to the legal effect thereof, and, this being true, equity will reform the instrument....

In the case of *State v. Wales, supra,* the court held that where both grantors and the agent for the State intended the deeds granting lands to the State for highway purposes should convey an easement only and not a fee simple, there was a mutual mistake of the parties which a court of equity could correct. Other cases of reformation of a written instrument because of a mistake as to the legal meaning of terms used are *Miles v. Martin*, 159 Tex. 336, 321 S.W.2d 62 (1959); *Gammage v. Moore & Moore*, 42 Tex 170 (1875); *Weaver v. First*

*National Bank of Amarillo*, 532 S.W.2d 416 (Tex.Civ.App.—Waco 1976, no writ); *Martin v. Snuggs*, 302 S.W.2d 676 (Tex. Civ.App.—Fort Worth 1957, writ ref'd n.r. e.); *Markum v. Markum*, 210 S.W. 835 (Tex.Civ.App.—Amarillo 1919, writ dism'd); *Zieschang v. Helmke*, 84 S.W. 436 (Tex.Civ. App.1904, no writ). In many other states, equity has provided for reformation for mutual mistakes of law.[14]

Cherokee contends that the area of the law allowing reformation for such a mistake is limited to a situation in which the parties reach an agreement and then the wrong words are chosen in drafting that agreement. One of the earlier cases dealing with the distinction for this type of case is *Kelley v. Ward*, 94 Tex. 289, 60 S.W. 311 (1901). These cases are generally grouped under the label of mistakes in the integration (or mistake of the scrivener), as opposed to the other type of cases under mistakes of law which are labelled mistakes in the inducement.

In the present case, the agent had a standardized agreement which had been drafted prior to the negotiations. We see no reason why the principle of equity allowing reformation should not apply where parties mistakenly enter into a standardized agreement if they are mutually mistaken as to the legal consequences of that agreement, or where there is any material mutual mistake, without regard to type, if all of the surrounding facts and circumstances warrant it.[15]

Perhaps the reasoning behind the general requirement of a mistake in integration is expressed in 10 Tex.Jur.3d *Cancellation & Reformation* § 121 (1980):

> Inasmuch as the court is without power to make a contract that the parties did not make, an actual agreement reached

---

**14.** *Atchison v. City of Englewood*, 568 P.2d 13 (Colo.1977); *Kolker v. Gorn*, 193 Md. 391, 67 A.2d 258 (1949); *Scott v. Grow*, 301 Mich. 226, 3 N.W.2d 254 (1942); *Dundon v. Balthazar*, 114 Vt. 312, 44 A.2d 156 (1945); *Weatherford v. Weatherford*, 199 Or. 290, 260 P.2d 1097 (1953); *Essington v. Buchele*, 79 S.D. 544, 115 N.W.2d 129 (1962); *Haslem v. Ottosen*, 689 P.2d 27 (Utah 1984).

**15.** M. Sherman, *Mistake-Reformation of Instruments-Equitable Relief is Proper to Correct a Mistake of Law.—Miles v. Martin*, 159 Tex. 336, 321 S.W.2d 62 (1959), 37 Texas L.Rev. 918 (1959).

prior to the drafting of the instrument involved is essential to reformation.

However, in the situation in the present case, there is ample evidence for the jury to find a meeting of the minds between the Rogers brothers and Cherokee's agent. The discussion concerning the option rights on the minerals was not a collateral matter, nor was it a matter casually mentioned after the execution of the deed, but testimony indicates that it was a mutual understanding involving an integral part of the written document. The fact that the instrument had been prepared prior to the agreement should not bar reformation. Therefore, we hold that the issues as submitted properly included the element of mutual mistake which would entitle appellees to reformation.

The appellees have filed two cross-points complaining of the exclusion of certain testimony objected to and sustained as hearsay.

The mineral owners offered testimony from two witnesses to the fact that Clyde Hall, author of the deed in question, had construed that the option clause did not apply to mineral leases made by the grantors. John Ford, a Kilgore attorney, offered to testify that he had discussed the option language with Hall on several occasions and that he had asked, on behalf of his clients, for a release or waiver of the option in connection with his client's lease. Ford testified that Hall told him that the provision for the option applies only to the sale of minerals and not to oil and gas leases. The other proposed witness was Martha Dickerson, Hall's secretary in 1947. The excluded testimony by Dickerson was that "in the years following the Lake Cherokee sales, Clyde Hall was getting some inquiries from people who were needing—they thought they needed releases." Hall told them that "he wasn't going to prepare any." The mineral owners contended the inference from this testimony was that Hall believed that the option provision in the deed did not pertain to leases, and therefore, he saw no need to prepare such releases.

■ This evidence would be admissible on the issue of mutual mistake to show that Hall (as Cherokee's agent) took a position inconsistent with Cherokee's position in the suit. *Alston v. Pierson* 158 S.W. 1165 (Tex.Civ.App.—Fort Worth 1913, no writ). Rule 801(e)(2) of the Texas Rules of Evidence provides that a statement is not hearsay if it is an admission by a party-opponent. This provision entails, among other situations, a statement offered against a party which had been made by his agent or servant concerning a matter within the scope of his agency or employment and made during the existence of the relationship. The admission exception has been applied to statements made by the agent after the completion of the transaction. *St. Louis I.M. & S. Ry. Co. v. Carlisle*, 34 Tex.Civ.App. 268, 78 S.W. 553 (1904, no writ); *Cooper Grocer Co. v. Britton*, 74 S.W. 91 (Tex.Civ.App. 1903, no writ). According to the testimony of both of the witnesses, Hall was contacted for the purpose of getting releases or waivers of the option, which indicated that he was still serving Cherokee in regards to the transactions. Parol evidence of conversations which show the beliefs and intentions of parties have long been admissible on the issue of mutual mistake. *Smith v. Jones*, 192 S.W. 795 (Tex.Civ.App.—Amarillo 1917, writ ref'd). The errors on the cross-points did not affect the outcome of the trial, and thus are harmless.

The judgment of the trial court is affirmed.

BLEIL, Justice, dissenting.

I differ with the majority on three fundamental issues: (1) whether evidence of statements made by G.W. Sharp about the agreement between the Rogers and Clyde Hall constitutes hearsay, (2) whether sufficient evidence exists to show that Sharp, as Hall's agent, had actual or apparent authority to negotiate and enter into an agreement which had the exact opposite meaning of the words used in the deed prepared by Hall, and (3) whether reformation is appropriate under the circumstances of this case. I also disagree on other legal

issues, and on the sufficiency of the evidence to support the verdict.

The majority camouflages the real issues.[1] While the numerous authorities referred to by the majority do support the various propositions put forth by the majority, these propositions relate only to the general issues before the Court.

Undoubtedly, the majority arrives at what it considers to be a just result in this case. After all, the result is exactly the same as the result reached in this Court's previous decision in this case, *Forderhause v. Cherokee Water Co.*, 623 S.W.2d 435 (Tex.Civ.App.—Texarkana 1981), *rev'd*, 641 S.W.2d 522 (1982), although that decision was reversed because of legal errors. *Cherokee Water Co. v. Forderhause*, 641 S.W.2d 522 (Tex.1982). I believe that the majority's decision today is as incorrect as was this Court's prior decision.

## THE HEARSAY

The majority treats the hearsay issue in such a manner as to make it blend into the background of the opinion. Although Cherokee raises this issue in its first point of error, the majority deals with this key issue only after it has used this hearsay evidence, along with other evidence and the jury findings, to determine that Sharp was an agent acting within the scope of his employment.

In dealing with the hearsay issue, the majority apparently holds that: (1) all the evidence concerning what Sharp said to anyone is not hearsay because it is an admission by a party-opponent pursuant to Tex.R.Evid. 801(e)(2)(E); (2) the testimony is admissible to show "operative acts" and is not hearsay because it was not introduced to show the truth of the matter stated; and (3) the testimony was admissible as a state of mind exception to the hearsay rule pursuant to Tex.R.Evid. 803(3).

*Admission by Party-Opponent*

The majority concludes that the testimony by others about what Sharp said was not hearsay because it was an admission by a party-opponent. This conclusion assumes that Sharp was either an agent or a servant of Cherokee speaking on a matter within the scope of his agency or employment during the existence of the relationship. There is *no* evidence that Sharp was a servant or agent of Cherokee. Not only was there no evidence of this type of relationship between Sharp and Cherokee, there was no mention of this type of relationship during the entire trial. Further, there was not even a hint of the existence of this type of relationship between Sharp and Cherokee by either party on appeal. There is not even an inkling that Sharp had ever heard of Cherokee or that it had heard of him. The best evidence that the majority finds to support its conclusion is that Sharp purported to be Hall's agent and that Hall had served in various capacities as both attorney and trustee for Cherokee. There are missing links in any chain that purports to show that Sharp was an agent or servant of Cherokee; thus the majority's logic fails.

*Operative Acts*

As another ground to support the admission of testimony by various witnesses about what Sharp said, the majority concludes that Sharp's statements were "operative acts." The majority states that the testimony of what Sharp said is admissible because Sharp's statements were not introduced to show the truth of the matter asserted, but rather to show "operative acts." The majority's reasoning is somewhat flawed. The cases the majority cites do not support its conclusion that Sharp's statements are admissible as "operative acts." Those cases hold that in mutual mistake cases, parol evidence is admissible to go behind the agreement as written to show the true intent of the parties. *Pegues v. Dilworth*, 134 Tex. 169, 132 S.W.2d 582 (1939); *State v. Wales*, 271 S.W.2d 728

---

1. Even the plethora of footnotes seems more to disguise rather than to support the Court's holdings.

(Tex.Civ.App.—Beaumont 1954, writ ref'd n.r.e.). This is, of course, correct. However, the cases do not say that *hearsay* parol evidence is admissible; in each of the majority's cases, testimony as to intent was supplied by the actual party whose intent was in question. Here, the Rogers seek to prove Sharp's intent by testimony as to what Sharp said. Neither the majority's parol evidence cases nor a bare assertion that the statements are "operative acts" can change the ultimate hearsay nature of this testimony. For the principle of operative acts to apply, the statements must not be offered to prove the truth of the matter asserted; rather, the statements must be offered to show the mere making of the statement, rather than its truth. 1A R. Ray, Texas Law of Evidence Civil and Criminal § 795 (Texas Practice 3d ed. 1980). For example, in *United States Fire Ins. Co. v. Skatell*, 596 S.W.2d 166 (Tex. Civ.App.—Texarkana 1980, writ ref'd n.r. e.), the fact that a theft was reported was held admissible, not for the truth of the statement made in reporting the theft, but to show that such a report was made, which was an operative act.

When the principle of operative acts is applied to our case, it becomes apparent that Sharp's statements of intent cannot be considered operative acts. It is not the act of his making the statements, but rather the content of the statements themselves which is essential to the cause of action for reformation of a contract on the ground of mutual mistake. To show that both parties were mistaken in their intent, it is obviously necessary to show both parties' intent. The proof of Sharp's intent lies in the testimony of others of what Sharp said his intentions were. The testimony is clearly offered to prove that Sharp's intentions were, in fact, what the witnesses say he said they were and is thus hearsay. The mere fact that Sharp made the statements has no relevance in a suit for reformation of a contract based on mutual mistake. The only way these statements are relevant is if they are offered to prove Sharp's beliefs and intent.

Typical of the statements complained of as being hearsay is the following testimony by Fairy Rogers concerning what Sharp said:

Q Now, let me ask you this. Did Mr. Sharp, in your presence, say anything about whether what you've just read to the Jury did or did not apply to oil and gas leases?

A He said we could lease it when we wanted to—any time we wanted to to anybody. He said that [referring to the option clause in the lease which she had just read] didn't apply to it, and we taken it that way because we had a chance to lease several times and we didn't ask them because we didn't think we had to ask them.

. . . .

Q Did you folks tell Mr. Sharp anything about the sale of minerals, whether or not you intended to sell the minerals?

A Oh, yes. We told him we never aimed to sell them throughout our lifetime. It was ours to keep, never to sell. We didn't want to sell them to Cherokee Water Company or anybody else. We were just keeping them to lease.

Q All right. What, if anything, did you say about wanting to lease the property? What did you tell Mr. Sharp about that?

A Well, we wanted to lease it, of course. We'd love to lease it.

Q And do I understand that he told you that what you read to the Jury wouldn't affect that right?

A Right.

Tex.R.Evid. 801(d) provides that hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the *matter asserted*. Tex.R.Evid. 801(c) defines the term "matter asserted" to include "any matter explicitly asserted, and any matter implied by a statement, if the *probative value of the statement as offered flows from declarant's belief as to the matter*." (emphasis added). Clearly, the majority errs in concluding that the testimony concerning Sharp's statements was not hearsay when the only value of his

statements was that they asserted his belief as to the meaning of certain language in the contract.

*State of Mind Exception*

The majority also concludes that even if the testimony concerning Sharp's statements is hearsay, it may still be admissible as an exception to prove Sharp's state of mind pursuant to Rule 803(3). On its face, that rule is inapplicable. It provides that the statement of a declarant's then-existing state of mind *does not include a statement of "belief to prove the fact remembered or believed* unless it relates to the execution, revocation, identification, or terms of declarant's will." (emphasis added). Tex.R.Evid. 803(3). Nothing that the witnesses testified that Sharp said would be admissible under this exception because that testimony was offered to prove what Sharp believed.

## THE AGENCY

In deciding the questions concerning hearsay, as well as in several other areas of its opinion, the majority deals with the questions of whether there was any evidence, and if so, whether that evidence was sufficient to support determinations that Sharp was an agent for Hall, who served as attorney and trustee for Cherokee. The majority concludes that Sharp was an agent or subagent of Cherokee, even though neither the trial court nor the attorneys before that court or this Court have ever made this claim.

In response to the majority's loose reference to Sharp's serving as an agent of Cherokee, I will do no more than point out that there is not even a suggestion of this relationship in the evidence. The majority can point to no such evidence because there is none.

I find no support for the conclusion that Sharp was a subagent of Cherokee, either. The Restatement (Second) of Agency § 5(1) (1958) defines a subagent as follows:

A subagent is a person appointed by an agent empowered to do so, to perform functions undertaken by the agent for the principal, but for whose conduct the agent agrees with the principal to be primarily responsible.

There is no evidence that Hall was Cherokee's agent. But, even if there were, there still would be no evidence that Hall was empowered to appoint an agent. Subagency is a contractual relationship that depends on the terms of the agreement of parties. *See* 2A C.J.S. *Agency* § 35 (1972). There is no showing of any agency agreement between Hall and Cherokee, much less the terms of such agreement. Thus, Sharp is not a subagent.

The majority addresses the agency questions in various areas of its opinion. It recites that Hall was a lawyer and that he had worked as a lawyer for Cherokee in various capacities. It then adds that he purchased property for Cherokee as trustee. From this point the majority jumps to the conclusion that Hall was therefore an agent for Cherokee. The majority opines that "The fact that Hall is called a trustee in the deed does not prevent a determination that he was in fact an agent.... Furthermore, it is possible for the role of trustee and agent to coexist." The majority observes that the fact that Hall is called a trustee does not prevent a determination that he was an agent, and that it is "possible" for the role of trustee and agent to coexist. Based on these possibilities, and in the absence of any evidence whatsoever, the majority concludes that Hall was an agent of Cherokee. The majority then refers to Hall as Cherokee's "trustee/agent." This conclusion seems to be an exercise of a novel fact-finding power not normally possessed by a court of appeals.

Cherokee specifically asserts a lack of evidence to support the jury findings that Sharp had actual or apparent authority to negotiate and enter into an agreement with the Rogers to the effect that the words in the deed were to have an effect precisely the opposite of the legal meaning of those words.[2]

**2.** When the other portion of this case was before the Court, the majority noted in passing

that in the "technical legal sense" an oil and gas lease amounts to a defeasible conveyance, cit-

The majority notes that it is undisputed that Sharp was sent out by Hall to obtain signatures on the deeds, highlighting the fact that the dead or the absent rarely are able to refute the allegations of a witness in court. The majority then appears to recognize that the doctrine of apparent authority cannot apply to this case because that doctrine has no application to transactions involving real estate, citing *Bugh v. Word*, 424 S.W.2d 274 (Tex.Civ.App.—Austin 1968, writ ref'd n.r.e.) and *Goode v. Westside Developers*, 258 S.W.2d 844 (Tex. Civ.App.—Waco 1953, writ ref'd n.r.e.). However, it concludes that the jury was instructed not only concerning apparent authority but also concerning express or implied actual authority, and finds the circumstantial evidence sufficient to support a finding of actual and implied authority.

No evidence shows that Sharp had actual authority to represent, on behalf of Hall, that the words in the deed, which had been prepared and completed by Hall, had a meaning exactly the opposite of those words. The majority's holding that he had such authority is absurd.

Also, the holding that Sharp had actual authority to make that representation conflicts with *Hall v. F.A. Halamicek Enterprises, Inc.*, 669 S.W.2d 368 (Tex.App.—Corpus Christi 1984, no writ). In that case, Halamicek sent a certified public accountant to solicit investments in an oil and gas lease. The accountant went out with charts and maps pertaining to the oil and gas well covered by the lease and indicated that he was acting on behalf of Halamicek. The court there, under circumstances more favorable to the establishment of an agen-

cy relationship than those in this case, concluded that the agency was not established by any express agreement and if it existed at all, the agency relationship had to arise by implication and the doctrine of apparent authority. Here, no actual authority is shown and there cannot be any apparent authority. Yet the majority holds that there might have existed some undefined implied authority.

THE USE OF REFORMATION

Reformation of an instrument based on mutual mistake is limited by the principle that the Court cannot create an agreement that the parties themselves did not make. *Continental Oil Company v. Doornbos*, 402 S.W.2d 879 (Tex.1966). The purpose of reformation is to conform the mistaken instrument to antecedent expressions on which the parties had already agreed. *Brinker v. Wobaco Trust Ltd.*, 610 S.W.2d 160 (Tex.Civ.App.—Texarkana 1980, writ ref'd n.r.e.); *see also* 3 A. Corbin, Corbin on Contracts § 614 (1960). The antecedent oral agreement of the parties is normally treated as the binding contract; the written agreement then is conformed by the court to the oral agreement. An acknowledged authority on equity puts it this way:

> Reformation is appropriate, when an agreement has been made, or a transaction has been entered into or determined upon, as intended by all the parties interested, but in reducing such agreement or transaction to writing, either through the mistake common to both parties, or through the mistake of the plaintiff accompanied by the fraudulent knowledge and procurement of the defendant, the

ing, by footnote, *Mills v. Brown*, 159 Tex. 110, 316 S.W.2d 720 (1958). But the majority then proceeded to ignore that law because of what it termed "common knowledge in the area of real estate transactions and in the oil and gas business in particular...." *Forderhause v. Cherokee Water Co.*, 623 S.W.2d 435, 439 (Tex.Civ.App.—Texarkana 1981), *rev'd*, 641 S.W.2d 522 (1982). The Supreme Court reversed the decision of this Court in a unanimous opinion. Now the majority says that:

> The language of the instrument lends itself to misinterpretation by laymen, who generally do not think of the term *sale* as encompassing the term *lease*.

Whatever laymen may generally think, the only evidence of record indicates that Clyde Hall was not a layman, but was in fact a lawyer who, to some extent, specialized in land transactions and oil and gas matters. And he would have known that the law in 1938, as it does today, holds that an oil and gas lease is a sale of an interest in land. *W.T. Waggoner Estate v. Sigler Oil Co.*, 118 Tex. 509, 19 S.W.2d 27 (1929). The majority appears to go to great lengths to avoid the mandates of the Supreme Court's decision in *Cherokee Water Co. v. Forderhause*, 641 S.W.2d 522 (Tex.1982).

written instrument fails to express the real agreement or transaction. In such a case the instrument may be corrected so that it shall truly represent the agreement or transaction actually made or determined upon according to the real purpose and intention of the parties.

3 J. Pomeroy, Equity Jurisprudence § 870 (5th ed. 1941). Reformation based on mutual mistake is proper when the mistake was made in reducing the contract to writing, and not if the mistake was made in the making of the contract which the writing evidences. There can be no reformation unless the minds of the parties met in a prior contract, agreement, or understanding to which the instrument can be conformed. *See* 76 C.J.S. *Reformation of Instruments* §§ 18, 25(c) (1952); 10 Tex. Jur.3d *Cancellation and Reformation* (1980). The Second Restatement of Contracts announces this same rule:

> Where a writing that evidences or embodies an agreement in whole or in part fails to express the agreement because of a mistake of both parties as to the contents or effects of the writing, the court may at the request of a party reform the writing to express the agreement. . . .

Restatement (Second) of Contracts § 155 (1981). Texas follows this rule. *Sun Oil Co. v. Bennett*, 125 Tex. 540, 84 S.W.2d 447 (1935).

The majority acknowledges that the reasoning behind the requirement of a mistake in the integration of an agreement is that expressed in 10 Tex.Jur.3d *Cancellation and Reformation* § 121 (1980): the Court is without power to make a contract that the parties did not make and that an actual agreement reached *prior to the drafting of the instrument involved is essential to reformation.* However, the majority, after noting this rule, goes on to hold that the fact that the instrument had been prepared before the agreement makes no difference and should not bar reformation. Although the majority cites six cases in support of this novel concept, not one of them lends support to the majority's holding.

The two Supreme Court cases cited by the majority do not support its holding. *Miles v. Martin*, 159 Tex. 336, 321 S.W.2d 62 (1959), holds that a person who, because of a mistake of law as to the effect of words used in a conveyance, has transferred to another more than he intended and more than the parties mutually agreed he should, is entitled to restitution of the excess. This clearly implies the existence of an antecedent agreement, the very element which the majority seeks to delete from the law.

The other Supreme Court case cited is *Gammage v. Moore*, 42 Tex. 170 (1875). This case holds that when there is a mistake made in preparing an instrument embodying a contract, and the mistake is properly alleged and proven, the instrument may be conformed to correspond with the real contract. Once again we see the necessity for an antecedent agreement with which the contract is reformed to comport.

Neither do the Courts of Civil Appeals cases cited by the majority lend any support to the majority's thesis. Typical of these cases is *Weaver v. First National Bank of Amarillo*, 532 S.W.2d 416 (Tex. Civ.App.—Waco 1976, no writ). It holds that:

> [W]here the parties to an instrument are in clear agreement as to the factual and legal result they wish to accomplish by it, but, by mutual mistake, the legal effect of the words they use does not produce that result, the case is a proper one for reformation of the instrument to make it conform to the antecedent intention of the parties; and parol proof is admissible to show the mistake and its mutuality.

The facts of our case do not lend themselves to reformation because no agreement existed with which the instrument could be conformed.

*Martin v. Snuggs*, 302 S.W.2d 676 (Tex. Civ.App.—Fort Worth 1957, writ ref'd n.r. e.), holds that a mistake in an instrument caused by the parties or a draftsman employed by them phrasing the instrument in terms not apt to express the actual agreement will support reformation, provided

that the mistake is embodied in the instrument and was not made subsequent to it. It further states that equity will grant relief against the mistake of both parties, when, in the effort to reduce an agreement to writing, they mistake its terms so that the writing does not represent the real contract.

The majority's search for authority also leads it to cite *Markum v. Markum,* 210 S.W. 835 (Tex.Civ.App.—Amarillo 1919, writ dism'd), and *Zieschang v. Helmke,* 84 S.W. 436 (Tex.Civ.App.—1904, no writ). *Markum* cites 3 J. Pomeroy, Equity Jurisprudence § 843 (5th ed. 1941), for the following:

> If an agreement or written instrument or other transaction expresses the thought and intention which the parties had at the time and in the act of concluding it, no relief, affirmative or defensive, will be granted with respect to it, upon the assumption that their thought and intention would have been different if they had not been mistaken as to the legal meaning and effect of the terms and provisions by which such intention is embodied or expressed, even though it should be incontestably proven that their intention would have been different if they had been correctly informed as to the law.

This is no support for the majority's position because it presupposes the existence of an agreement of the parties before the existence of a written document evidencing that agreement. Finally, the majority relies on *Zieschang v. Helmke, supra.* It holds that if, after making an agreement, the instrument through a mistake of law made during the process of reducing it to writing, fails to express the contract which the parties actually entered into, equity will intervene with appropriate relief. In such a case there is no mistake as to the legal import of the contract actually made, but rather the mistake is one of law which prevents the real contract from being embodied in the written instrument.

The case before us does not involve an antecedent agreement, but rather an antecedent writing. There was no clear prior agreement between the parties as to the factual and legal result desired. Rather, Hall prepared and had printed a deed form, then caused the blank spaces in the form to be completed with a typewriter. Only after that did Hall seek the execution of the completed deed. The intent underlying this written document, expressed by its unambiguous terms, was that Hall was granted the first option to lease the oil, gas and other minerals reserved by the Rogers in that deed. *Cherokee Water Co. v. Forderhause,* 641 S.W.2d 522 (Tex.1982). The majority, far from conforming the document to an antecedent agreement, thwarts the parties' intent as expressed by the written contract.

The majority additionally errs by not following the principle that ignorance of the law is no excuse. When parties reach an agreement and then draw up a document embodying this agreement, but in error use words, the legal effect of which is different from the result intended, the parties' ignorance of the legal effect of the language used will not bar a reformation of the contract as written to conform with the actual intent. *Kelley v. Ward,* 94 Tex. 289, 60 S.W. 311 (1901); *Weaver v. First National Bank of Amarillo, supra.* Reformation is allowed because the antecedent intent of the parties controls over the language used to reduce this antecedent intent to writing. The majority cites no case holding that ignorance of the meaning of a term in a document already prepared, without any antecedent agreement, can be grounds for reformation. Indeed, such a holding would result in a gratuitous reversal of the centuries-old presumption of knowledge of the law. This presumption has recently been reaffirmed in Texas, *see Gulf Oil Corp. v. Southland Royalty Co.,* 478 S.W.2d 583 (Tex.Civ.App.—El Paso 1972), *aff'd,* 496 S.W.2d 547 (Tex.1973), holding that courts must presume that contracting parties are knowledgeable of law and contract accordingly. *Cf. Morris v. Reaves,* 580 S.W.2d 891 (Tex.Civ.App.—Houston [14th Dist.] 1979, no writ).

## SUFFICIENCY OF THE EVIDENCE

Excluding the hearsay evidence, I would hold that there is no evidence to support

the jury's findings concerning Sharp's authority as an agent and concerning mutual mistake. However, Cherokee also attacks each of the jury findings as not having sufficient evidentiary support.

Even if all of the testimony about what Sharp said was admissible or not objected to, I would find insufficient evidence to support the agency relationship to the extent that Sharp could represent that the words in the deed meant the opposite of what they said. And, I would find insufficient evidence to support a mutual mistake finding.

The deed in question was given in 1947. This reformation suit was tried in 1986—thirty-nine years later. The evidence tending to prove the extent of an agency relationship and the existence of a mutual mistake as to the legal effect of the language used was of marginal probative value. Corbin has observed that "human memory is less reliable than are written records, especially when it is influenced by disappointment in results. This is the chief reason for reducing agreements to written form." 3 A. Corbin, Corbin on Contracts § 607 (1960). There was little evidence from those directly involved to show that the parties entered into an agreement after negotiation but then signed a deed which had the exact opposite legal effect.

Clyde Hall did not testify. G.W. Sharp did not testify. Paul Rogers did not testify, nor did his wife. C.E. Rogers did not testify, nor did his wife. J.E. Rogers did not testify, but his wife, Fairy Rogers, did. She said that:

[W]e wanted to keep our mineral rights. We were not giving no sale to our minerals. We were keeping them, and we better put it in writing because they might try to take it from us. And so we definitely didn't want to let our minerals (sic) rights go. That was ours. We was selling them the surface right only.

. . . .

We told him we never aimed to sell them throughout our lifetime. It was ours to keep, never to sell. We didn't want to sell them to Cherokee Water Company or anybody else. We were just keeping them to lease.

. . . .

Well, we wanted to lease it, of course. We'd love to lease it.

Reviewing this and the other evidence, the majority, after a passing glance, finds the evidence sufficient. I disagree and feel that the majority's decision desanctifies the written word.

In several other less significant respects I differ with the majority in its treatment of the issues raised in this appeal. Because of all my differences with the majority, I respectfully dissent.